# ROCHESTER TELEPHONE CORP. *v.* UNITED STATES ET AL.

No. 481.   Argued March 7, 1939.—Decided April 17, 1939.

*Mr. T. Carl Nixon,* with whom *Messrs. E. Willoughby Middleton* and *Justin J. Doyle* were on the brief, for appellant.

*Mr. Hugh B. Cox,* with whom *Assistant Solicitor General Bell, Assistant Attorney General Arnold,* and *Messrs. Robert M. Cooper* and *William J. Dempsey,* and *Elizabeth C. Smith* were on the brief, for appellees.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an appeal, under § 238 of the Judicial Code as amended (28 U. S. C. § 345), from a final decree by a district court of three judges, under the Urgent Deficiencies Act of October 22, 1913 (28 U. S. C. §§ 45, 47a) as extended by § 402 (a) of the Federal Communications Act (47 U. S. C. § 402 (a)), dismissing on the merits a bill to review an order of the Federal Communications Commission.

At the outset a challenge to the jurisdiction of the District Court confronts us. It involves those problems of administrative law which are implied by the doctrine of "negative orders." Inasmuch as this phrase is shorthand for a variety of situations, sharp heed must be given to the precise circumstances—*inter alia,* the statutory provisions for review, the terms of the contested order, the grounds of objection to it—which in this and other cases have invoked the doctrine.

Section 2 (b) of the Communications Act of 1934 provides that, with certain exceptions not here material, the Communications Commission shall not have jurisdiction over any carrier "engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with, such carrier." The appellant, Rochester Telephone Corporation (hereafter called the Rochester), is a New York corporation maintaining a system of telephone communications in and around the City of Rochester. For present purposes the Rochester is to be

deemed as engaged in interstate communications solely because of physical connections with the facilities of the New York Telephone Company (hereafter called the New York).

The present controversy grew out of a ruling by the Federal Communications Commission that the Rochester owed obedience to a series of orders issued by the Commission. These orders required all telephone carriers subject to the Act to file schedules of their charges, copies of contracts with other telephone carriers, information concerning their corporate and service history, their relations with affiliates, their use of franks and passes. Copies of these orders were duly served on the Rochester. No response being had, the Telephone Division of the Communications Commission, on October 9, 1935, ordered the Rochester to show cause why it should not be required to file responses to the general orders theretofore served upon it.[1] The Rochester answered, claiming to be outside the requirements of the Act except as to matters not here questioned.

To ascertain the facts in the contested issue, the Commission appointed a trial examiner. At hearings held by him the Rochester entered a special appearance, denying the Commission's jurisdiction and contending that the burden of proof was on the Commission to show that Rochester did not come within the exclusionary provisions of § 2 (b) (2). After a thorough hearing[2] and the submission of briefs, the examiner filed his report, to which the Rochester duly excepted. Upon the basis of these proceedings and of argument before it, the Commission, through its Telephone Division, sustained the findings of its chief examiner, determined that the Rochester was

---

[1] On November 13, 1935, the order was amended in matters not here relevant.

[2] The hearing before the examiner lasted two days; 221 pages of testimony were taken and 34 exhibits were introduced.

under the "control" of the New York and therefore not entitled to the classification of a mere connecting carrier under § 2 (b) (2). Accordingly, the Commission ordered the Rochester classified "as subject to all common carrier provisions of the Communications Act of 1934, and, therefore, subject to all orders of the Telephone Division." A petition for rehearing before the full Commission was denied.

The Rochester thereupon filed the present bill, alleging that the order entered by the Commission on November 18, 1936, pursuant to its Report, was contrary to undisputed facts and erroneous as a matter of law, and that the Commission's threat to enforce it put the Rochester to the hazard of irreparable injury, and praying that the District Court

"make and enter its order and decree setting aside and annulling said orders of the Federal Communications Commission hereinbefore mentioned, and each and all of them, and enjoining the enforcement of said orders, except in so far as the provisions of said orders . . . have already been complied with."

The case was disposed of in the District Court on the pleadings and the record before the Commission.

Below, the Government made no objection to the District Court's jurisdiction, nor did that Court raise the question *sua sponte*.[3] It sustained the Commission's action on the merits and dismissed the bill. Here, the Government urges that under the doctrine of "negative orders" the Commission's order was not reviewable, but, in the alternative, supports the decree on the merits.

The relation of action by the Federal Communications Commission to the reviewing power of the courts is here

---

[3] Under *United States* v. *Corrick*, 298 U. S. 435, 440, and *United States* v. *Griffin*, 303 U. S. 226, 229, the doctrine of "negative orders" implies a jurisdictional defect which courts must consider *sua sponte*.

for the first time.  The jurisdictional objection raised by the Government in this case implicates other federal regulatory bodies as well, because the various statutory schemes for judicial review have either been carried over from the Urgent Deficiencies Act, pertaining to orders under the Acts to Regulate Commerce, or because different statutory provisions have by analogy been assimilated to the "negative order" doctrine.  That doctrine has not had wholly plain sailing in the many cases, both here and in the lower federal courts, since it first got under way in 1912, in *Procter & Gamble Co.* v. *United States*, 225 U. S. 282.

The important procedural problems with which this case is entangled therefore call for clarification.

The prior decisions involving the "negative order" doctrine fall into three categories: [4]

(1) Where the action sought to be reviewed may have the effect of forbidding or compelling conduct on the part of the person seeking to review it, but only if some further action is taken by the Commission.  Such a situation is presented by an attempt to review a valuation made by the Interstate Commerce Commission which has no immediate legal effect although it may be the basis of a subsequent rate order.

(2) Where the action sought to be reviewed declines to relieve the complainant from a statutory command forbidding or compelling conduct on his part.  The most obvious case is a denial of permission by the Interstate Commerce Commission for a departure from the long-short haul clause.

---

[4] All except one of the prior decisions of this Court on the "negative order" doctrine involved review of action by the Interstate Commerce Commission.  *United States* v. *Corrick, 'supra*, note 3, involved review of action by the Secretary of Agriculture under the Packers and Stockyards Act.

(3) Where the action sought to be reviewed does not forbid or compel conduct on the part of the person seeking review but is attacked because it does not forbid or compel conduct by a third person. A familiar example is that of a shipper requesting the Interstate Commerce Commission for an order compelling the carrier to adopt certain rates or practices which the Commission, on the merits, declines. Another instance is where the Commission authorizes the carrier to depart from the long-short haul clause and a shipper adversely affected seeks to have the authorization set aside.

In group (1) the order sought to be reviewed does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action. In view of traditional conceptions of federal judicial power, resort to the courts in these situations is either premature or wholly beyond their province. Thus, orders of the Interstate Commerce Commission setting a case for hearing despite a challenge to its jurisdiction,[5] or rendering a tentative[6] or final valuation[7] under the Valuation Act, although claimed to be inaccurate, or holding that a carrier is within the Railway Labor Act and therefore amenable to the National Mediation Board, are not reviewable.[8]

The governing considerations which keep such orders without the area of judicial review were thus summarized for the Court by Mr. Justice Brandeis in denying reviewability of a "final valuation" under the Valuations Act: "The so-called order here complained of is one which does not command the carrier to do, or to refrain from

---

[5] *United States* v. *Illinois Central R. Co.,* 244 U. S. 82. Compare *Federal Power Comm'n* v. *Metropolitan Edison Co.,* 304 U. S. 375.

[6] *Delaware & Hudson Co.* v. *United States,* 266 U. S. 438.

[7] *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299.

[8] *Shannahan* v. *United States,* 303 U. S. 596; compare *Shields* v. *Utah Idaho Central R. Co.,* 305 U. S. 177, 182–184.

doing, anything; which does not grant or withhold any authority, privilege or license; which does not extend or abridge any power or facility; which does not subject the carrier to any liability, civil or criminal; which does not change the carrier's existing or future status or condition; which does not determine any right or obligation." *United States* v. *Los Angeles & S. L. R. Co.*, 273 U. S. 299, 309–310.

Plainly the denial of judicial review in these cases does not derive from a regard for the special functions of administrative agencies. Judicial abstention here is merely an application of the traditional criteria for bringing judicial action into play. Partly these have been written into Article III of the Constitution by what is implied from the grant of "judicial power" to determine "Cases" and "Controversies," Art. III, § 2, U. S. Constitution.[9] Partly they are an aspect of the procedural philosophy pertaining to the federal courts whereby, ever since the first Judiciary Act, Congress has been loath to authorize review of interim steps in a proceeding.[10]

---

[9] *Hayburn's Case*, 2 Dall. 409, is the symbol for considerations which limit the constitutional power of the federal courts, though that case itself never reached adjudication. See, also, *United States* v. *Ferreira*, 13 How. 40; *Muskrat* v. *United States*, 219 U. S. 346.

[10] Prior to § 7 of the Act of March 3, 1891, authorizing an appeal to the Circuit Court of Appeals from a decree granting a preliminary injunction, review in a case not involving a final judgment was unknown in the federal judicial system, except insofar as it was present in the practice of certification introduced by § 6 of the Act of April 29, 1802. See *United States* v. *Bailey*, 9 Pet. 267. For state court decisions the requirements for finality of the original Judiciary Act have been adhered to. § 237, Judicial Code as amended, 28 U. S. C. § 344. Review of action of the federal district courts not involving final judgments can be had only in a limited class of cases dealing with interlocutory injunctions, receiverships, and criminal appeals. §§ 129 and 238 of the Judicial Code as amended, 28 U. S. C. §§ 227, 345. This Court, however, may take jurisdiction on certiorari before the appellate jurisdiction of the circuit court of appeals is exhausted.

Group (2) is composed of instances of statutory regulations which place restrictions upon the free conduct of the complainant. To rid himself of these restrictions the complainant either asks the Interstate Commerce Commission to place him outside the statute, or, being concededly within it, he invokes the Commission's dispensing power. In this type of situation a complainant seeking judicial review under the Urgent Deficiencies Act of adverse action by the Commission must clear three hurdles: (a) "case" or "controversy" under Article III; (b) the conventional requisites of equity jurisdiction; (c) the specific terms of the statute granting to the district courts jurisdiction in suits challenging "any order" of the Commission.

Where a complainant seeks the Commission's authority under the terms of a statute and the Commission's action is followed by legal consequences, as was the case in *Lehigh Valley R. Co.* v. *United States*, 243 U. S. 412, or where the Commission's order denies an exemption from the terms of the statute, as in the *Intermountain Rate Cases*, 234 U. S. 476, the road to the courts' jurisdiction seems to be clear. There is a constitutional "case" or "controversy," *Interstate Commerce Comm'n* v. *Brimson*, 154 U. S. 447; the requirements of equity are satisfied if disregard of the Commission's adverse action entails threat of oppressive penalties; and the suit is within the express language of the Urgent Deficiencies Act in that it is one "to enjoin, set aside, or annul" an "order of the Commission." 28 U. S. C. §§ 46, 47.[11] While the penal-

---

[11] The *Lehigh Valley* case apparently originated the statement, often made in "negative order" cases, that the risk results from the statute, not from the order. But this formula hardly squares with the actualities of the situation in that case. The Panama Canal Act, paragraphs 19–21 of § 5 of the Act to Regulate Commerce, as amended, forbade community of interest between any common carrier subject to the Act and a competing water carrier. Under

ties may be imposed by the statute for its violation and not for disobedience of the Commission's order, a favorable order would render the prohibitions of the statute inoperative. The complainant can come into court, of course, not to review action within the discretionary au-

---

paragraph 20, jurisdiction was conferred on the Commission to determine questions of fact as to the existence of actual or potential competitive conditions, either on the application of the carrier or on the Commission's motion, its determination to be filed. Under paragraph 21, the Commission was given jurisdiction to extend the time within which operations otherwise prohibited by the statute might be carried on after July 1, 1914, if such extension did not reduce competition and benefited the public. After receipt of notice of the Act from the Commission, the Lehigh applied to the Commission for a ruling that it was not subject to the Act, or, in the alternative, for an extension. The Commission issued an order subjecting the Lehigh to the Act and denying an extension. Thereupon the Lehigh brought a suit to set aside this order and to enjoin the Commission from enforcing it.

As a practical matter the risk of prosecution to which the Lehigh was subjected if it wished to continue to operate its boats was the result of the order. Since the Panama Canal Act provided that the Commission should find the facts under it, there could have been no prosecution without a previous finding by the Commission that the Lehigh was within the Act; once such a finding was made it was subject to the rule of administrative finality. Compare *Keogh* v. *Chicago & N. W. Ry. Co.*, 260 U. S. 156. Therefore the Commission's order that the Lehigh was subject to the Panama Canal Act was responsible for the risk, as much so as if it had expressly commanded the Lehigh to stop running its boat lines. And assuming the Lehigh was within the prohibition of the statute, the Commission's order denying an exception had the same practical effect as a direct command. *Intermountain Rate Cases*, 234 U. S. 476.

*Piedmont & Northern Ry. Co.* v. *United States*, 280 U. S. 469, presents a more complicated situation. Section 1 (18–22) of the Act to Regulate Commerce, as amended, prohibits any common carrier by rail subject to the Act from extending its lines or constructing new lines without a certificate of convenience and necessity. This requirement did not apply to "interurban electric railways, which are not operated as a part or parts of a general steam rail-

thority of the Commission to render an adverse rather than a favorable decision but because he urges errors of law outside the Commission's final say-so. Such an analysis emerges from a long sequence of cases under the Urgent Deficiencies Act viewed in the setting of general doctrines of federal jurisdiction. On the other hand, the result in the *Lehigh Valley* case was reached in the earlier phases of modern administrative law and did not deal with its specific jurisdictional problems in the perspective of underlying principles governing federal equitable jurisdiction. In consequence, the phrase "negative orders" gained currency as though it were descriptive of some technical doctrine of jurisdiction having peculiar relevance to judicial review of orders of the Interstate Commerce Commission and comparable regulatory bodies.[12]

---

road/system of transportation." Upon an application for a certificate by the Piedmont & Northern, coupled with a motion to dismiss on the ground that it was an "interurban electric" railway, for which no certificate was required, the Commission denied the motion to dismiss and denied the certificate on the merits. The bill to enjoin the Commission from taking any proceedings against the Piedmont & Northern under this order attacked the action of the Commission solely on its assumption of jurisdiction. The Court held the order was not reviewable, on the ground that the order did not adjudicate the railroad's status, did not command it to do anything, but only had the effect of increasing the Piedmont's doubts as to the correctness of its construction of the statute. To be sure, statutory construction is a judicial function. But this is to view the matter too abstractly. For the Commission itself had instituted the system whereby it requested preliminary submission to it of the status of "interurban" roads. Such a decision was at least the equivalent of a threat of prosecution under the statute, and, in fact, considerable weight is given to administrative practice in ascertaining the meaning of such legislation. Compare *United States* v. *Village of Hubbard*, 266 U. S. 474.

[12] The initial decision in this group of cases, the *Intermountain Rate Cases*, 234 U. S. 476, held reviewable the action of the Commission in refusing to grant requested consent to depart from the long-short haul clause. (§ 4 of the Act to Regulate Commerce,

This brings us to the cases in group (3). Here review is sought of action by the Commission which affects the complainant because it does not forbid or compel conduct with reference to him by a third person. This type of situation is illustrated by *Procter & Gamble Co.* v. *United States,* 225 U. S. 282. Since this case gave rise to the notion that there is a specialized jurisdictional doctrine pertaining to "negative orders," it calls for re-examination. Procter & Gamble Co. filed a complaint with the Interstate Commerce Commission to set aside demurrage rules that imposed charges on private cars left unloaded for over forty-eight hours on private tracks. The Commission dismissed the complaint on the ground that the rules were within the carriers' authority to make conditions for the acceptance of private cars. Procter & Gamble then petitioned the Commerce Court to annul the Commission's action and to enjoin the carriers from enforcing the rules. The Commerce Court took jurisdiction but found the Commission's action to be within its authority. On appeal this Court held that the Com-

as amended.) While this case would seem to control the *Lehigh Valley* case and at least to be persuasive in the *Piedmont & Northern* case, it was not mentioned in them. After these two cases, subsequent decisions in this group indicated that the "negative order" doctrine might prevent review of the refusal by the Secretary of Agriculture to accept rates for filing, the Packers and Stockyards Act prohibiting the charging of rates except those on file with the Secretary, *United States* v. *Corrick,* 298 U. S. 435, and of the refusal to grant an increase in rates of compensation for carrying of mail, the Railway Mail Pay Act of 1916 requiring the carrier to carry the mail at the rate set, *United States* v. *Griffin,* 303 U. S. 226. But in both these decisions the result reached was supported by factors irrelevant to the present discussion. On the other hand, in *Powell* v. *United States,* 300 U. S. 276, action of the Commission, striking from its files a tariff on the ground that a point was not served by the carrier, was held subject to review as a command to the railway which had filed the tariff not to give the service covered by the tariff.

merce Court erred in taking jurisdiction and remanded the cause for dismissal.

Clearly Procter & Gamble was authorized under § 13 of the Act to Regulate Commerce to institute the proceedings before the Commission. Since it asserted a legal right under that Act to have the Commission apply different principles of law from those which led the Commission to dismiss the complaint, the ingredients for an adjudication—constituting a case or controversy—were present. Compare *Interstate Commerce Comm'n* v. *Brimson, supra; Interstate Commerce Comm'n* v. *Baird,* 194 U. S. 25, 38. Judicial relief would be precisely the same as in the recognized instances of review by courts of Commission action: if the legal principles on which the Commission acted were not erroneous, the bill would be ordered dismissed; if the Commission was found to have proceeded on erroneous legal principles, the Commission would be ordered to proceed within the framework of its own discretionary authority on the indicated correct principles. The requisites of equity have of course to be satisfied, but by the conventional criteria. They were satisfied in the *Procter & Gamble* case, since the bill sought to avoid a multiplicity of suits. Finally, the shipper was within the express language of Congress authorizing suits "to enjoin, set aside, annul, . . . any order of the Interstate Commerce Commission." To be sure, the opinion in the *Procter & Gamble* case partly yielded to the Government's main contention in that case that the jurisdictional statute only applied where the order complained of was one which was to be enforced by the Commission. More recent decisions of this Court, however, have dispensed with this requisite for review.[13]

---

[13] The *Chicago Junction Case,* 264 U. S. 258; *Venner* v. *Michigan Central R. Co.,* 271 U. S. 127.; *Colorado* v. *United States,* 271 U. S. 153; *Claiborne-Annapolis Ferry Co.* v. *United States,* 285 U. S. 382; *United States* v. *Idaho,* 298 U. S. 105.

The impelling consideration underlying the decision in the *Procter & Gamble* case did not concern technical procedure. It was part of the process of adjusting relations between the Interstate Commerce Commission and the courts to effectuate the purposes of the Commission. This is made abundantly clear by the general atmosphere of the opinion as well as by its language,[14] particularly when regard is had to the fact that the Court's spokesman was Chief Justice White, who had such a large share in developing modern administrative law.[15] While the

[14] " . . . we have learned of no instance where it was held or even seriously asserted, that as to subjects which in their nature were administrative and within the competency of the Commission to decide, there was power in a court, by an exercise of original action, to enforce its conceptions as to the meaning of the act to regulate commerce by dealing directly with the subject irrespective of any prior affirmative command or action by the Interstate Commerce Commission. On the contrary, by a long line of decisions, whereby applications to enforce orders of the Commission were considered and disposed of or where requests to restrain the enforcement of such orders were passed upon, it appears by the reasoning indulged in that it was never considered that there was power in the courts as an original question without previous affirmative action by the Commission to deal with what might be termed in a broad sense the administrative features of the act to regulate commerce by determining as an original question that there had been a compliance or noncompliance with the provisions of the act." 225 U. S. at 296-97. " . . . the recognition of a right in a court to assert the power now claimed would of necessity amount to a substitution of the court for the Commission or at all events would be to create a divided authority on a matter where from the beginning primary singleness of action and unity was deemed to be imperative." 225 U. S. at 298-99.

[15] See Chief Justice Taft's estimate of the services of Chief Justice White in "a new field of administrative law": "The capital importance which our railroad system has come to have in the welfare of this country made the judicial construction of the interstate commerce act of critical moment. It is not too much to say that Chief Justice White in construing the measure and its great amendments has had more to do with placing this vital part of our practical govern-

138

Interstate Commerce Commission had been in existence since 1887, the enlargement of its powers through the Hepburn Act, in 1906,[16] and the Mann-Elkins Act, in 1910,[17] the establishment of similar agencies in many states following the lead of New York [18] and Wisconsin,[19] the widespread recognition that these specific instances marked a general movement,[20] made increasingly manifest the place of administrative agencies in enforcing legislative policies and called for accommodation of the duties entrusted to them to our traditional judicial system. This Court "ascribed" to the findings of the Commission "the strength due to the judgments of a tribunal appointed by law and informed by experience." *Illinois Central R. Co.* v. *Interstate Commerce Comm'n*, 206 U. S. 441, 454. Recognition of the Commission's expertise also led this Court not to bind the Commission to common

ment on a useful basis than any other judge. His opinions in the case of the *Texas & Pacific Railway Co.* v. *The Abilene Cotton Oil Co.*, and the cases which followed it, are models of clear and satisfactory reasoning which gave to the people, to state legislatures, to Congress, and the courts a much-needed knowledge of the practical functions the Commerce Commission was to discharge, and of how they were to be reconciled to existing governmental machinery, for the vindication of the rights of the public in respect of national transportation. They are a conspicuous instance of his unusual and remarkable power and facility in statesmanlike interpretation of statute law." Proceedings on the Death of Chief Justice White, 257 U. S. v, xxv.

[16] 34 Stat. 584.

[17] 36 Stat. 539.

[18] Laws of New York, One Hundred and Thirtieth Session, c. 429 (1907).

[19] Wisconsin Laws of 1907, c. 499, st. 1797 m.

[20] See, *e. g.*, Hughes, *Some Aspects of the Development of American Law* (1916) 39 N. Y. B. A. Rep. 266, 269–70; Root, *Public Service by the Bar* (1916) 41 A. B. A. Rep. 355, 368–69; Sutherland, *Private Rights and Government Control* (1917) 42 A. B. A. 197.

law evidentiary and procedural fetters in enforcing basic procedural safeguards.[21]

From these general considerations the Court evolved two specific doctrines limiting judicial review of orders of the Interstate Commerce Commission. One is the primary jurisdiction doctrine, firmly established in *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426. Thereby matters which call for technical knowledge pertaining to transportation must first be passed upon by the Interstate Commerce Commission before a court can be invoked.[22] The other is the doctrine of administrative finality. Even when resort to courts can be had to review a Commission's order, the range of issues open to review

[21] *Interstate Commerce Comm'n* v. *Baird*, 194 U. S. 25, 44; *Interstate Commerce Comm'n* v. *Louisville & Nashville R. Co.*, 227 U. S. 88, 93; *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274, 288; compare *Douglas* v. *Noble*, 261 U. S. 165, 169. "It is, perhaps, not too much to say that not a single case arising before the Commission could be properly decided if the complainant, the railroad, or the Commission were bound by the rules of evidence applying to the introduction of testimony in courts." Twenty-second Annual Report of the Interstate Commerce Commission, 10.

[22] See, also, *e. g.*, *Baltimore & Ohio R. Co.* v. *United States ex rel. Pitcairn Coal Co.*, 215 U. S. 481; *Robinson* v. *Baltimore & Ohio R. Co.*, 222 U. S. 506; *United States* v. *Pacific & Arctic Co.*, 228 U. S. 87; *Texas & Pacific Ry. Co.* v. *American Tie Co.*, 234 U. S. 138; *Northern Pacific Ry. Co.* v. *Solum*, 247 U. S. 477; *Director General* v. *Viscose Co.*, 254 U. S. 498; *Dayton-Goose Creek Ry. Co.* v. *United States*, 263 U. S. 456; *Western & Atlantic R. Co.* v. *Georgia Public Service Comm'n*, 267 U. S. 493; *Midland Valley R. Co.* v. *Barkley*, 276 U. S. 482; *Board of Railroad Comm'rs* v. *Great Northern Ry. Co.*, 281 U. S. 412. The doctrine has been given general application, *e. g.*, *United States Navigation Co.* v. *Cunard Steamship Co.*, 284 U. S. 474 (Shipping Board); *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41 (National Labor Relations Board). Compare, also, *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210; *Anniston Mfg. Co.* v. *Davis*, 301 U. S. 337.

is narrow. Only questions affecting constitutional power, statutory authority and the basic prerequisites of proof can be raised. If these legal tests are satisfied, the Commission's order becomes incontestable. *Interstate Commerce Comm'n* v. *Illinois Central R. Co.,* 215 U. S. 452, 470; *Interstate Commerce Comm'n* v. *Union Pacific R. Co.,* 222 U. S. 541.

In translating these important objectives for effectuating the Congressional scheme to enlarge the independent powers of the Interstate Commerce Commission into a seemingly technical distinction between "negative" and "affirmative" orders, the opinion in *Procter & Gamble* v. *United States* gave authority to a doctrine which harmonizes neither with the considerations which induced it nor with the course of decisions which have purported to follow it.[23] Subsequent cases have made it abundantly clear that "negative order" and "affirmative order" are not appropriate terms of art.[24] Thus, the Court has had occa-

---

[23] In *Manufacturers Railway Co.* v. *United States,* 246 U. S. 457, the Court treated as reviewable the action of the Commission in failing to require an absorption of switching charges or a requested joint rate but held not reviewable refusal to fix divisions. In part this may have been on the theory that the issue of the divisions was not properly before the Commission. See 246 U. S. at 482–483. In *United States* v. *New River Co.,* 265 U. S. 533, the Court held reviewable the action of the full Commission dismissing a complaint by a shipper against certain car practices held invalid by one division of the Commission. *Standard Oil Co.* v. *United States,* 283 U. S. 235, held not reviewable the action of the Commission refusing to grant reparations, but the main basis of the decision was not the "negative order" doctrine but the statutory scheme dealing with reparations. In *Alton R. Co.* v. *United States,* 287 U. S. 229, the Court held reviewable the action of the Commission refusing to interfere with divisions set by a railroad in violation of a previous agreement, the Court stating that the action of the Commission validated divisions which were previously invalid. See 287 U. S. at 236–237.

[24] The only test which can be derived from the cases in notes 11–13, 23, *supra,* is that an order is "affirmative" if it has the legal effect

sion to find that while an order was "negative in form" it was "affirmative in substance." [25] "Negative" has really been an obfuscating adjective in that it implied a search for a distinction—non-action as against action—which does not involve the real considerations on which rest, as we have seen, the reviewability of Commission orders within the framework of its discretionary authority and within the general criteria of justiciability.[26] "Negative"

of changing the *status quo*, permitting what was previously not allowed or compelling what was previously not required. But on this test the order in the *Lehigh Valley* case was "affirmative." The decision in the *New River Coal Co.* case could hardly be hung on such a gossamer thread as this test, since there the only change in the *status quo* resulting from an order considered "affirmative" was that the order of the full Commission held unobjectionable a car practice which was the subject of complaint. A division of the Commission in the same proceeding had stated that the practice was invalid and should be abandoned and it was abandoned. After the full Commission found the practice not invalid and dismissed the complaint, the practice was adopted again.

[25] See *Alton R. Co.* v. *United States,* 287 U. S. 229, 235.

[26] This becomes clear on analysis of the precise problem presented in the *Procter & Gamble* case. It was a dispute between shippers who owned private cars and those who did not as to the distribution of the cars owned by the carriers. The Commission was called upon to resolve that economic conflict by virtue of its authority to prevent practices which unfairly discriminated against one group at the expense of the other. Its final decision was based on a comprehensive policy concerning the place of private cars in our transportation system. Had the prior practice of the carriers been inconsistent with this policy, and the order of the Commission compelled a change, the private car shippers would admittedly have been entitled to test the validity of the Commission ruling in the courts, subject, of course, to the canons of administrative finality. It seems capricious that the fact that the Commission's order authorizing the preservation of the *status quo* should block any review at all. The force of this reasoning is emphasized when it is realized what small factors may determine whether the *status quo* has been changed, *e. g.*, a difference of views within the Commission, as in the *New River Coal Co.* case, *supra,* note 24. See the opinion of the

and "affirmative," in the context of these problems, is as unilluminating and mischief-making a distinction as the outmoded line between "nonfeasance" and "misfeas-ance." [27]

The considerations of policy for which the notions of "negative" and "affirmative" orders were introduced, are completely satisfied by proper application of the combined doctrines of primary jurisdiction and administrative finality. The concept of "negative orders" has not served to clarify the relations between administrative bodies and the courts but has rather tended to obscure them. An action before the Interstate Commerce Commission is akin to an inclusive equity suit in which all relevant claims are adjusted.[28] An order of the Commission dismissing a complaint on the merits and maintaining the *status quo* is an exercise of administrative function, no more and no less, than an order directing some change in status. The nature of the issues foreclosed by the Commission's action and the nature of the issues left open, so far as the reviewing power of courts is concerned, are the same. Refusal to change an existing situation may, of course, itself be a factor in the Commission's allowable exercise of discretion. In the application of relevant canons of judicial review an order of the Commission directing the adoption of a practice might raise considerations absent from a situation where the Commission merely allowed such a practice to continue. But this bears on the disposition of a case and should not control jurisdiction. The nature of judicial relief, that is the

---

Commerce Court sustaining reviewability in *Procter & Gamble Co.* v. *United States*, 188 F. 221.

[27] The Restatement of Torts does not employ this nomenclature. See, also, 7, LABATT, MASTER AND SERVANT, § 2586.

[28] Compare *Inland Steel Co.* v. *United States*, 306 U. S. 153, 157: " . . . the Commission was acting in the interest of shippers generally and in behalf of the public and the national railroad system."

form of directions available, in situations like those presented by the *Procter & Gamble* and the *Lehigh Valley* cases, were the Commission's orders reviewed, would be no different than was that used in the *Intermountain Rate* and the *New River Coal Co.* cases.[29]  In both types of situations "a judgment rendered will be a final and indisputable basis of action as between the Commission and the defendant," *Interstate Commerce Comm'n* v. *Baird*, 194 U. S. 25, 38.  We conclude, therefore, that any distinction, as such, between "negative" and "affirmative" orders, as a touchstone of jurisdiction to review the Commission's orders, serves no useful purpose, and insofar as earlier decisions have been controlled by this distinction, they can no longer be guiding.

The order of the Communications Commission in this case was therefore reviewable.  It was not a mere abstract declaration regarding the status of the Rochester under the Communications Act,[30] nor was it a stage in an incomplete process of administrative adjudication.  The

---

[29] In the *Procter & Gamble* case the judicial relief asked was that the order of the Commission dismissing the complaint against the demurrage rules be annulled and that the carriers be enjoined from applying those rules.  In the *New River Coal Co.* case the judicial relief asked was that the car rule under attack be adjudged invalid, that the order of the Commission dismissing the complaint against it be adjudged invalid, that the carriers be enjoined from complying with the rule and that the Commission be enjoined from restricting the commerce of the complainants by its order and by the rule.

In the *Lehigh Valley* case the judicial relief asked was that the enforcement of the order of the Commission and the institution of any proceedings thereunder against the complainant be enjoined.  In the *Intermountain Rate* cases the judicial relief asked was that the order of the Commission be set aside, that § 4 of the Act to Regulate Commerce be declared invalid, and that the Commission and the Attorney General be enjoined from taking any proceedings to prosecute the carriers for violation of § 4.

[30] Compare *United States* v. *Atlanta, B. & C. R. Co.*, 282 U. S. 522.

contested order determining the status of the Rochester necessarily and immediately carried direction of obedience to previously formulated mandatory orders addressed generally to all carriers amenable to the Commission's authority. Into this class of carriers the order under dispute covered the Rochester, and by that fact, in conjunction with the other orders, made determination of the status of the Rochester a reviewable order of the Commission.

But while the Rochester had a right to challenge the order, it cannot prevail on the merits.

The ultimate legal issue is the validity of the Commission's finding that the Rochester "is under the control of the New York Telephone Company." The justification for this finding clearly emerges from a rapid summary of the governing facts adduced before the Commission concerning the relationship between the New York and the Rochester.

Prior to 1920 an independent telephone company and the New York (which was part of the Bell system) were competitors in Rochester. As part of an endeavor to meet an arrangement which the Bell system had, in 1913, made with the Department of Justice, the details of which need not here be recited, the Rochester was formed to consolidate the two previously competing enterprises. The property of the independent was paid for by bonds of the Rochester, and the property of the New York by preferred stock, later designated as second preferred, of which the New York had the entire issue, 48,140 shares at $100 par. The Rochester issued 1000 shares of common stock, at $100 par, of which the New York purchased 335 shares. The New York also paid the officers of the independent company $70,000 for their services in consummating the consolidation, but $66,500 of this amount was to be used in purchasing the remaining 665 shares of common stock

for deposit in a voting trust. Other outstanding securities of the Rochester, first preferred stock and bonds, neither of which had any voting rights, were held by the public. There were complicated limitations upon the voting rights of the second preferred stockholders, but the dominating circumstances touching voting rights were that in major matters no vote of stockholders could be effective unless concurred in by eighty per cent of the common stock and that the Executive Committee and the Board of Directors were elected by cumulative voting of the common stock, thereby assuring New York five out of fifteen members of the Board of Directors and two members in an Executive Committee of five.

Putting all these factors in the context of the circumstances under which the Rochester came into being, the manner in which it was financed, the operation of the voting trust, and the stake of the New York in the Rochester, the Commission, after full hearing and due consideration, concluded that

"the New York Company, through stock ownership, is the dominant financial factor in the respondent company and also, that this, taken together with their contractual arrangements and other pertinent facts and circumstances appearing in the record, unquestionably gives the New York Company power to control the functions of the Rochester Telephone Corporation."

The record amply justified the Communications Commission in making such findings. Investing the Commission with the duty of ascertaining "control" of one company by another, Congress did not imply artificial tests of control.[31] This is an issue of fact to be determined by the special circumstances of each case. So long

---

[31] See House Report 1850, 73d Cong., 2d Sess., 4–5; compare 78 Cong. Rec. 8446.

as there is warrant in the record for the judgment of the expert body it must stand. The suggestion that the refusal to regard the New York ownership of only one third of the common stock of the Rochester as conclusive of the former's lack of control of the latter should invalidate the Commission's finding, disregards actualities in such intercorporate relations. Having found that the record permitted the Commission to draw the conclusion that it did, a court travels beyond its province to express concurrence therewith as an original question. "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." . *Mississippi Valley Barge Line Co.* v. *United States,* 292 U. S. 282, 286–287; *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 303, *et seq.*

*Decree affirmed.*

MR. JUSTICE McREYNOLDS concurs in the result.

MR. JUSTICE BUTLER.

Appellant's complaint shows that prior to making its final order November 18, 1936, the commission made general orders 1, 2, 3, 5, 6a and 9, directing that every telephone carrier subject to the Act file statements concerning its business and affairs. Declining to recognize the Act as applying to it, appellant withheld compliance. The commission ordered it to obey or to file answer setting forth the facts on which it relied as justification for failure so to do. Appellant then applied to the commission for determination that it is not subject to the Act or the commission's jurisdiction because exempted under § 2 (b) (2). After hearing, the commission made the final order declaring appellant subject to all common carrier provisions of the Act "and, therefore, subject to all orders of the Telephone Division applicable to wire telephone car-

riers . . ." Thus plainly it made the general orders above mentioned applicable to appellant.

The complaint challenged the validity of these orders on the ground *inter alia* that appellant as a matter of law is, and by the evidence and facts found by the commission is shown to be, not subject to any of them. The prayer is for decree "setting aside and annulling said orders . . . and each and all of them and enjoining the enforcement of" them. In the district court, appellees raised no question as to its jurisdiction. But here they argue: The commission's determination classifying the appellant as subject to its jurisdiction and to the general orders is not an order reviewable under the terms of the Urgent Deficiencies Act of 1913; the determination neither commands nor directs appellant to do or refrain from doing anything; the commission could not have instituted a proceeding to enforce it and consequently the court has no jurisdiction to set it aside.

The final order is much more than a mere determination that appellant is subject to the Act. When read, as it must be, in connection with the general orders, it unmistakably puts appellant under a series of affirmative mandates which, if valid, may be enforced under the Act. See 47 U. S. C. §§ 401, 409, 501, 502; 28 U. S. C. § 47, made applicable by 47 U. S. C. § 402a. These unequivocally impose upon appellant burden and expense of preparing and reporting to the commission a vast amount of statistical and other information.

The case presents no debatable question as to the jurisdiction of the district court. A statement of the facts alleged conclusively shows that in purpose, terms and effect the final order constitutes not mere determination or declaration but affirmative commands. There is no occasion to review earlier decisions dealing with affirmative and negative administrative orders and obviously

148

none to overrule any of them or to repudiate or impair the doctrine they establish.* The Court's discussion, extraneous to the issue involved, confuses rather than clarifies.

The findings of the district court are amply sustained by the evidence, and its decree should be affirmed.

MR. JUSTICE MCREYNOLDS concurs in this opinion.

---

* See e. g.: *Procter- & Gamble* v. *United States*, (1912) 225 U. S. 282, 292 *et seq.* *Hooker* v. *Knapp*, 225 U. S. 302. *United States* v. *Baltimore & Ohio R. Co.*, 225. U. S. 306, 320. *Lehigh Valley R. Co.* v. *United States*, 243 U. S. 412. *United States* v. *Illinois Central R. Co.*, 244 U. S. 82, 89. *Chicago Junction Case*, 264 U. S. 258, 263–264. *United States* v. *New River Co.*, 265 U. S. 533, 539–541. *Delaware & Hudson Co.* v. *United States*, 266 U. S. 438, 448. *Minneapolis & St. L. R. Co.* v. *Peoria Ry. Co.*, 270 U. S. 580. *Colorado* v. *United States*, 271 U. S. 153, 161. *United States* v. *Los Angeles & S. L. R. Co.*, 273 U. S. 299, 309. *Gt. Northern Ry. Co.* v. *United States*, 277 U. S. 172. *Piedmont & N. Ry. Co.* v. *United States*, 280 U. S. 469, 475–477. *United States* v. *Atlanta, B. & C. R. Co.*, 282 U. S. 522. *Standard Oil Co.* v. *United States*, 283 U. S. 235. *Alton R. Co.* v. *United States*, 287 U. S. 229. *United States* v. *B. & O. R. Co.*, 293 U. S. 454. *Powell* v. *United States*, 300 U. S. 276, 284. *United States* v. *Griffin*, 303 U. S. 226, 232 *et seq.* *Shannahan* v. *United States*, 303 U. S. 596, 599.