**AMERICAN TRUCKING ASS'NS, Inc., et al.**
**v. UNITED STATES et al.**
Civil Action No. 285.

District Court, E. D. Virginia.
July 17, 1944.

396

J. Ninian Beall, of Washington, D. C., S. W. Shelton, of Richmond, Va., and Roland M. Rice, of Washington, D. C., for plaintiffs.

Edward Dumbauld, Sp. Asst. to Atty. Gen., and John V. Cogbill, Asst. U. S. Atty., of Richmond, Va., for the United States.

Daniel H. Kunkel, of Washington, D. C., for Interstate Commerce Commission.

Thomas L. Preston, and Charles T. Abeles, both of Norfolk, Va., for receivers of Seaboard Air Line Ry. Co., intervenors.

Before DOBIE, Circuit Judge and PAUL and BARKSDALE, District Judges.

DOBIE, Circuit Judge.

This is a civil action, 28 U.S.C.A. §§ 41 (28), 44, 45, 45a, 46, 47, 48, in which we are asked to set aside certain orders of the Interstate Commerce Commission (hereinafter called the Commission) and to grant certain incidental relief. These orders of the Commission granted to Legh Powell, Jr., and Henry Anderson, Receivers of the Seaboard Air Line Railway Company (hereinafter collectively referred to as Seaboard), certificates of public convenience and necessity, authorizing Seaboard to engage in interstate operations as a motor carrier over 14 routes in the States of Virginia, North Carolina, South Carolina, and Florida. Plaintiffs are the American Trucking Associations, Inc. (an organization formed in the interest of the highway trucking industry), and 6 motor carriers operating over the routes covered by the challenged certificates. Seaboard, by intervention, 28 U.S.C.A. § 45a, has been joined as a party defendant.

The 14 applications of Seaboard for certificates (with which we are concerned) were filed by Seaboard with the Commission (pursuant to the provisions of the Interstate Commerce Act, Part II, § 206, 49 U.S.C.A. § 306) at various times from February 23, 1937, to August 15, 1938. In due course, the Commission referred each application (severally and individually) to a Joint Board, composed of one member from each State in which there was any part of the operation covered by the specific application, 49 U.S.C.A. § 305(a).

The Joint Boards, after hearings on each of Seaboard's applications, issued reports, and appropriate certificates were, in every instance, granted by the Commission, subject to certain restrictions. One of these restrictions limited Seaboard's motor service to that which was strictly auxiliary to Seaboard's rail operations—that is, all transportation by motor was forbidden under the certificates unless there was a prior or subsequent shipment, in each instance, by rail. Seaboard, contending that this prior-or-subsequent-rail-haul restriction seriously impaired the value and utility of the certificates, petitioned the Commisson for a rehearing. This was granted by the Commission and the case was re-opened only for oral argument on this condition. Then the Commission eliminated the compulsory-rail-haul condition from the certificates and substituted therefor a so-called "key-station-plan," which restricted Sea-

board's motor service in connection with the designated key-points. Later again Seaboard sought and obtained another re-hearing, limited to modification of the key-points as these had been prescribed by the Commission. At this juncture, the Anti-trust Division of the Department of Justice intervened, claiming that Seaboard's motor operations would bring about a monopoly and strangulation of the independent motor trucking industry. This stage of the proceedings marks also the initial appearance of the American Trucking Associations, Inc., one of the plaintiffs in the instant civil action. The Commission modified certain portions of the key-point restrictions.

We now proceed to consider the questions raised in this case which we deem are of sufficient merit to deserve discussion.

1. *Constitution of Joint Boards—Consolidation of the Individual Applications.*

Plaintiffs vigorously attack the assignment of each application to a Joint Board, composed of one member from each State in which a motor service was sought in that application. This procedure satisfied the Motor Carrier Act, Part II, § 205 (a) and followed a well-established administrative practice. See United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345. In the absence of fraud (which is discussed later), the Commission, in determining the constitution and membership of the Joint Board, has consistently followed the scope of the proposed operations as these operations are designated and described in the application. See Argo and Collier Truck Lines Common Carrier Application, 27 M.C.C. 563, 566; and Atlantic Coast Line Railroad Company Extension of Operation, 30 M.C.C. 490, 491-2. Courts should give due weight to long continued administrative practice. See United States v. Moore, 95 U.S. 760, 24 L.Ed. 588; Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796. The Commission has often pointed out the inherent administrative difficulties in enforcing the Motor Carrier Act under any other interpretation. See 17 M.C.C. 413, 416, 417. Even when minor defects in the composition of the Joint Boards do appear, the courts have been (and should be) slow to set aside an order of the Commission on this ground. Empire Trails, Inc., v. United States, D.C., 53 F.Supp. 373;

North Coast Transportation Co. v. United States, D.C., 54 F.Supp. 448.

Section 205(a), Part II, of the Motor Carrier Act provides, in part:

"The Commission shall, when operations of motor carriers or brokers conducted or proposed to be conducted involve not more than three States, and the Commission may, in its discretion, when operations of motor carriers or brokers conducted or proposed to be conducted involve more than three States, refer to a joint board for appropriate proceedings thereon, any of the following matters arising in the administration of this part with respect to such operations as to which a hearing is required or in the judgment of the Commission is desirable: Applications for certificates, * * *. The joint board to which any such matter is referred shall be composed solely of one member from each State within which the motor carrier or brokerage operations involved in such matters are or are proposed to be conducted * * *. In acting upon matters so referred, joint boards shall be vested with the same rights, duties, powers, and jurisdiction as are hereinbefore vested in members or examiners of the Commission to whom a matter is referred for hearing and the recommendation of an appropriate order thereon: * * *."

Early and late, before the Joint Boards and before the Commission, timely motions and petitions were filed, praying for a stay of the proceedings and for a consolidation of the several applications, so that these applications could be referred to, and considered by, "properly constituted" Joint Boards, consisting of one member from each State in which an operation was desired under any of the applications. These motions and petitions for consideration were denied by the Joint Boards and the Commission.

Plaintiffs contend that this action was arbitrary and capricious and forms a ground for the setting aside by us of the Commission's orders. We find no merit in this contention. Such motions to consolidate are addressed to the sound discretion of the Commission. And we can discern in this record no warrant to justify us in holding that here the Commission has either abused this discretion or acted arbitrarily and capriciously. From all the testimony before it, the Commission was in a peculiar position to judge accurately whether the service sought under totality

of the applications was of such unified nature and such comprehensive scope as to call for consolidation of these applications and for their reference to a Joint Board which would be differently constituted. It is not without importance, in this connection, that, after these certificates were issued, some of the services thereunder authorized have never been inaugurated, while others, after being commenced by Seaboard, were subsequently abandoned.

### 2. Exclusion of Evidence—Fair Hearing.

■ Protesting motor carriers next complain of the refusal of the Joint Board to receive and consider certain evidence offered by protestants. As a result, we are told: "Every effort of plaintiffs to have the proceedings conducted under any semblance of a fair, reasonable and statutory hearing was summarily rejected by the Commission.

This complaint of plaintiffs is cognate to the Commission's refusal to consolidate the several applications of Seaboard. This proferred evidence covered a wide field and much of it might have been relevant had the Commission consolidated the applications. This evidence seems to have been excluded by the Joint Boards on the ground that each Joint Board was necessarily limited to deciding upon, and only upon, the particular application, or applications, before that Board.

Some evidence on the points which the protestants sought to develop did filter into the hearings before the Joint Boards. The Commission had before it the reports of all the Joint Boards. When, therefore, the Commission decided against consolidation, against a reopening of the case and against a rehearing of the matters, with the applications considered together as a whole, we think this contention of plaintiffs falls to the ground. Then, too, it is open to very serious question whether this excluded evidence would have, if admitted, influenced the decisions of the Commission.

### 3. Use of Improper Criteria as to Public Convenience and Necessity.

■ Very great stress is laid by plaintiffs on the contention that the Commission used false and improper criteria in arriving at its finding of public convenience and necessity in favor of Seaboard. It is urged upon us that the Commission substituted railroad economy and convenience for pub-

lic necessity; that the Commission unduly favored Seaboard by characterizing the "hybrid" combination of rail and motor service as new and unique; and that the Commission utterly disregarded the clear fact that the territories in question were fully and completely served by existing motor carriers.

The simple answer to the first point is that the Commission did not base its finding of public convenience and necessity solely or even primarily upon railroad economy and convenience. That factor (quite properly, we think) was merely considered by the Commission as one (among many) elements that influenced its decision."

■ The second point is not to be answered as a question of juristic semantics—whether the co-ordinated rail and motor service is in every respect a "new" service. All that we need hold on this point is that the Commission could (as it did) consider that the proposed motor service contemplated in the applications of Seaboard was a coordinated rail-motor service and, on that account, differed rather widely from the application of a pure motor carrier (rendering exclusively motor service) and also from an application by a railroad for permission to inaugurate motor service in a territory and field quite separate and divorced from its rail operations. This appears to have been a well settled policy of the Commission. See Kansas City Southern Transport Co., Inc.—Common Carrier Application, 10 M.C.C. 221, 235; Illinois Central Railroad Co.—Common Carrier Application, 12 M.C.C. 485, 495. Ample warrant for this, we think, can be found in many cases. We content ourselves with an extract from a very recent case decided by the United States Supreme Court.

Thus, in Thomson v. United States, 321 U.S. 19, 20, 64 S.Ct. 392, 393, Mr. Justice Murphy said:

"The motor trucks transport less than carload lots of freight in complete coordination with the rail service. The railroad instituted this additional method of transportation in order to furnish an improved and more convenient freight service to the public in certain areas of light traffic and in order to curtail car mileage and way-freight service. Motor vehicle transportation, in other words, is merely a new method of carrying on part of its all-rail freight business in which it had been engaged for many years."

The record does not support the contention that the Commission disregarded the ability of the independent motor carriers to furnish adequate service in the territories covered by Seaboard's applications. What the Commission did was to contrast this independent motor service with Seaboard's proposed coordinated motor-rail service, and then, in the light of this comparison, to weigh and appraise the elements and factors in each of the two types of service. There is ample warrant in the record for the Commission's finding that, under proper criteria reasonably applied, public convenience and necessity would be best served by granting these certificates of public convenience and necessity to Seaboard.

### 4. Monopoly.

The Commission found that the granting of these certificates to Seaboard would not create, or tend to create, a monopoly. And, further, the Commission stated: "Nor does it appear from the records made in these cases that there will be any great diversion of traffic from independent motor carriers." 17 M.C.C. 432. "Nor will they adversely affect the operations of existing motor carriers, nor restrain competition in the motor carrier field." 34 M.C.C. 444. There is ample evidence to support these findings. And, as the Commission aptly stated: "One competitive carrier has no vested right in the continuation by another of an inefficient method of operation, and we believe it to be neither the policy of Congress not the proper function of this Commission to retard any form of progress in transportation which will serve the public interest." 28 M.C.C. 10. We call attention again (as against the contention that the Seaboard contemplated a unified service paralleling almost its entire line for the purpose of creating a monopoly) that some of the services authorized by the certificates have never been inaugurated, while others of these services, once inaugurated, have been subsequently abandoned.

It seems clear that the enforcement of the federal anti-trust laws is not a primary function of the Commission nor can any decision of the Commission preclude an action in the federal courts for the enforcement of these laws. This whole situation, involving the inter-relations of the Commission and the courts as to anti-trust legislation, is discussed at some length in the opinion of Mr. Justice Rutledge in McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370.

### 5. Laches.

Seaboard has interposed the defense of laches as a defense to this civil action. The basis of this defense is that plaintiffs have unduly delayed in bringing this action, that, in the interval between the granting of these certificates and the institution of this action, Seaboard has acquired equipment, spent money and made many changes in its transportation facilities.

It was understood between counsel that, at the hearing before us, the record before the Commission would not be introduced and that no oral evidence would be offered. Counsel for plaintiffs, however, insisted on introducing the Commission record, and no objection was made to this. Seaboard then claimed that it must offer some oral evidence on the changes in its facilities which had been made in the period between the granting of the certificates and the institution of the instant civil action. Counsel for plaintiffs and for the United States strongly objected to this evidence. One official of the Seaboard was permitted to testify and a motion to strike this evidence was made by counsel and taken under advisement by the Court.

We prefer to base our decision in this case upon the broader and more important considerations previously discussed in this opinion. Accordingly, we do not feel called upon to pass upon either the validity of the defense of laches or the propriety of the oral evidence heard by this Court.

### 6. Fraud.

Counsel for plaintiffs have interposed into this case a charge of fraud on the part of Seaboard. We are euphemistically told, though, that fraud here is used as a legal concept and that any intention of charging any person connected with Seaboard with improper personal conduct is disclaimed. It is claimed, however: "The Commission exceeded its power and jurisdiction and acted arbitrarily and capriciously * * * in considering false and fictitious showings of convenience and necessity, deliberately fashioned by the applicant."

We might point out a slight inconsistency, in this connection, found in the complaint filed by plaintiffs. Thus, at one point in the complaint it is alleged: "The separate applications had the effect of concealing the true nature of the applications and of evading the statutory requirements for

a hearing." While, in another place, the complaint states: "The extent and scope of the proposed operations were disclosed to the Commission through numerous applications."

The Commission took pains to state:

"We now have the entire situation presented by the several applications before us in all of its aspects, following full and complete hearings." 17 M.C.C., 417.

We content ourselves by observing that we find nothing whatever in this record either to warrant or to substantiate this charge, even in its euphemistic, legal connotation.

### 7. The Position of the United States in this Case.

In every civil action to set aside an order of the Interstate Commerce Commission, the United States is, of course, a necessary party. When counsel for the United States appear and take part in the case, it is usually for the purpose of defending the order of the Commission, a coordinate branch of the federal government. In the instant case, however, counsel for the United States have confessed error, have admitted, the allegations of the complaint and have asked this Court to grant the desired relief to plaintiffs.

Seaboard's counsel tell us that the United States should not be heard in this anomalous role, which virtually amounts to stultification. See United States v. United States Gypsum Co., D.C., 53 F.Supp. 889.

We hold that the United States cannot confess error so as to make it binding upon us to grant the relief desired by plaintiffs. In McLean Trucking Co. v. United States, 321 U.S. 67, 69, 64 S.Ct. 370, error was confessed by the United States, yet the Supreme Court affirmed the decree of the three-judge District Court, refusing to set aside orders of the Commission. On the other hand, we were glad to consider the brief and oral argument of counsel for the United States, specially representing the Antitrust Division of the Department of Justice. The contentions advanced by these counsel we find to be lacking in substantial merit.

### 8. Separate Tariffs and Accounting for Motor Traffic.

Plaintiffs complain that the Commission's order which failed to require Seaboard to file separate tariffs, and to keep separate accounts, for its motor traffic (apart from its rail operations) is a violation of the Interstate Commerce Act, Part II, §§ 217, 220, 49 U.S.C.A. §§ 317, 320, and constitutes unfair discrimination in favor of Seaboard and against plaintiffs.

These are matters primarily entrusted to the sound discretion of the Commission. See United States v. Chicago Heights Trucking Co., 310 U.S. 344, 352, 60 S.Ct. 931, 84 L.Ed. 1243; Board of Trade v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432. And we should not here attempt to substitute our discretion (whatever action that may dictate) for the discretion vested in the Commission. It is conceded that this Court has no power to direct the Commission to issue an order directing Seaboard to file these separate tariffs and to keep these separate accounts. If, in actual practice, it should develop that such discrimination is thereby effected, an ample administrative remedy is afforded in the shape of an application to the Commission. See Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075.

### 9. Reflections on the Interstate Commerce Commission.

The printed brief of counsel for plaintiffs abounds in slurring remarks and exceedingly uncomplimentary references to the Commission. We quote a few of these: "To escape this dilemma, they invented the doctrine of 'new service'." "This hybrid monstrosity which is exclusively the brain child of the Interstate Commerce Commission * * *." "Truly the Commission's generosity to the railroads knows no bounds." "The Commission thinks it knows more about what is good for the country than Congress does. Therefore, the Commission has determined to handle the matter according to its own notions." "The Commission having decided to legislate in derogation of the will of Congress, it now goes through the fiction of a hearing and refuses to hear evidence." "The hearings which the Commission now holds on any railroad application for motor carrier rights are a farce. The matter has reached the point where no possible evidence could serve to show adequate existing services. No possible evidence could serve to overcome railroad desire and railroad convenience." "The 'hearings' are in effect, ex parte."

We find nothing in this record (or, for that matter, in the history of the Com-

mission) that would justify such unrestrained language about an administrative body of rather unusual age and somewhat exceptional distinction. The language, we think, adds nothing to either the strength of the case of the plaintiffs or to the credit of their counsel.

10. *Presumptive Validity of Commission's Orders.*

A long line of cases upholds the presumptive validity which attaches to the determination of an administrative tribunal, when the determination is subjected to review by the courts. See Rochester Telephone Corp. v. United States, 307 U.S. 125, 145, 59 S.Ct. 754, 83 L.Ed. 1147; Helvering v. Clifford, 309 U.S. 331, 336, 60 S.Ct. 554, 84 L.Ed. 788; Gray v. Powell, 314 U.S. 402, 412, 62 S.Ct. 326, 86 L.Ed. 301; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S. Ct. 281; Dobson v. Commissioner, 320 U. S. 489, 64 S.Ct. 239. These principles have been affirmed, and again applied to the Interstate Commerce Commission, by the Supreme Court in two very recent cases. Thus, in McLean Trucking Co. v. United States, 321 U.S. 67, 88, 64 S.Ct. 370, 381, Mr. Justice Rutledge said:

"If the Commission did not exceed the statutory limits within which Congress confined its discretion and its findings are adequate and supported by evidence, it is not our function to upset its order."

And Mr. Justice Jackson remarked in Interstate Commerce Comm. v. Jersey City, 64 S.Ct. 1129, 1139:

"It is not for the Court to set aside, without legislative command, its slow-wrought general principles which protect the finality and integrity of decisions of administrative tribunal."

For the reasons assigned, the prayer of the plaintiffs that we set aside the Commission's orders will be denied, judgment will be entered for the defendant, Interstate Commerce Commission, and the action of plaintiffs will be dismissed.

Action dismissed.

BARKSDALE, District Judge, concurs.

PAUL, District Judge (dissenting).

I am unable to agree with the conclusions reached by my colleagues in this case. I am of opinion that the contentions of the protestant motor truck operators, in which they are joined by the United States, are well founded in the following respects:

1. That by the refusal of the Commission to hear and consider evidence which the plaintiffs offered and which was pertinent to the questions before the Commission, a full and fair hearing was denied and to that extent the action of the Commission was unreasonable and arbitrary.

2. That the action of the Commission was based upon a mistake as to, or a failure to apply, the proper statutory standards in its determination of "public necessity and convenience."

I. On the first of these questions, the procedure taken in the case is significant. I understand it to have been substantially as follows:

The applications made by the railroad were some fourteen in number each relating to a segment of its existing rail line. No one of the routes applied for extended into more than two states. But many of these segments adjoined and in the aggregate the applications paralleled a large portion of the rail line. References of the several applications were made to joint boards, each of which considered only the route named in the particular application before it and all of which refused to hear evidence touching the effect of the operations made possible through the aggregated applications.

Upon the reports of the joint boards, the Commission granted the applications, subject to the condition (Condition 3) that shipments transported by the applicant's truck operations should be limited to those moving on a through bill of lading covering a prior or subsequent movement by rail. Upon petition of the railroad the Commission eliminated the condition requiring prior or subsequent rail haul and replaced it with a restriction whereby the motor transportation was limited by certain "key-points" on the railroad line. The railroad then petitioned for certain changes in the key-points as originally prescribed by the Commission. On a hearing on this latter petition all of the applications were consolidated, but the hearing was limited solely to the question of the modification of condition 3. At this hearing the Department of Justice sought to present evidence as to the effect of the railroad's motor truck operations with particular regard to conditions of competition. It later sought to have the case reopened and reheard for the same purpose. Both efforts were in-

effectual. It appears that at an earlier stage of the proceedings the protesting motor carriers had sought to have all of the applications consolidated in order that the issue of public convenience and necessity might be considered from the standpoint of the unified route created by the aggregate of the several applications, on which the protestants desired to present testimony. This request for consolidation was refused. The Commission evidently approved each of the different applications on the strength of the hearings and reports by the joint boards, where, in each instance the joint board had limited its consideration to the terms of the particular application before it and had refused to receive evidence touching the effect of the combined applications.

Whatever purpose the railroad had in putting its plans in the form of fourteen separate applications need not be considered. The fact is that when the various applications were filed, practically simultaneously, it was evident to the Commission that the plan contemplated various motor routes which operating together would cover a continuous route paralleling a large part of the railroad. By the removal of condition 3, the motor service was opened to traffic having no prior or subsequent rail haul and it was made possible to transport shipments entirely by truck from a point of origin in one route to a destination on the line of a contiguous route. The result, so it seems to me, was to establish a service in direct competition with existing truck routes. The Commission, however, proceeded on a theory that each abbreviated route applied for stood alone and refused to consider evidence showing the relationship between them and the effect of their combined operation. It acted solely upon a theory and ignored the actual facts before it.

It would seem, therefore, that at no stage of this proceeding were the protesting motor carriers permitted to present the testimony which they deemed pertinent and essential on the issue of public convenience and necessity. This testimony bore upon the relationship among the various truncated routes for which the railroad had applied and upon the practical effect of the assembled operation. The Department of Justice was similarly denied an opportunity to present evidence as to the effect of these combined operations in unduly restraining competition. The effect of this latter denial is emphasized by the fact that the effect upon competitive conditions could not possibly be determined except by consideration of the operations as a whole and by the further fact that under the statute, Act of Sept. 18, 1940, 54 Stat. 906, 49 U.S.C.A. § 5(2)(b) the Commission is required to find that granting of the application will be to the public advantage and will not unduly restrain competition.

It is true that the Commission made a finding of public convenience and necessity, but such a finding is in any case a conclusion supposedly based upon consideration of existing facts. I am not unmindful of the weight to be given to the findings of the Commission, but this presumes that such findings are the result of a full and fair hearing and consideration of all pertinent evidence offered bearing upon the issue before the Commission; a hearing at which both sides have an opportunity to be heard. The statement in the majority opinion that the excluded evidence, even if admitted, would probably not have influenced the decision of the Commission, does not satisfy the situation. The protesting parties were entitled to be heard. I am not saying that the Commission reached an erroneous conclusion, nor that if the excluded testimony had been heard a different conclusion would have been reached. Perhaps the finding would have been the same. But in such case it would have been the result of the full and fair hearing which the law contemplates and which, in my opinion, the protestants have never yet had.

II. I am further of opinion that in finding that the public convenience and necessity would be served by approval of these applications, the Commission failed to apply the proper criteria for determination of that question.

Without discussing it in detail it appears to me that the record discloses that consideration of these applications was from the standpoint only of whether the Seaboard would thereby be able to handle its freight traffic in a manner more economical and convenient to it. The applications were made by the railroad in the belief that by the use of a motor truck service it could handle certain classes of traffic with greater convenience and economy and it was upon this basis that the certificates were granted. I do not take it that this

satisfies the requirement that it is the public convenience and necessity which must be served.

Congress undoubtedly has recognized the existence of the various modes of transportation and sought to preserve the integrity and the advantages of each, without discriminations, preferences or advantages among them. A railroad has no authority, merely by the fact that it is a common carrier, to modify its method of carriage to that of a carrier by motor truck. When it seeks to do so no reason is seen why it is not subject to the same requirements as any other applicant for such privilege. In such case the test is not whether the railroad can carry on its existing business with greater economy and efficiency by the changed method of operation, but whether there is a public need for the creation of the new service. It is argued by the applicant that the term "public convenience and necessity" is generic, leaving to the Commission the widest latitude for its definition in the unlimited variety of circumstances which it may face. Without disputing this general statement it is evident that the phrase comprehends, not the needs of the applicant, but the needs of the community, the public by whom and to whom freight is shipped, and which presumably is indifferent to the method of transportation so long as it has some method which is as adequate and convenient as any other.

That the Commission did not apply these standards is in effect admitted by it in its brief, where it is argued:

"The fundamental error into which plaintiffs fall is the assumption that the service proposed by the railroad is a like and competitive service to that presently rendered by the truck operators along the route sought by the railroad, and consequently the application should have been governed by the same criteria as obtain where a new motor carrier seeks to invade a territory already occupied by existing motor carriers. In the latter instance questions of adequacy of existing service, the competitive effect of a new service, estimated traffic, and the ability of the communities served to support the new enterprise are pertinent issues upon which the evidence to be introduced by the plaintiffs might have had bearing. But these applications did not seek to establish a new and like transportation service; they sought merely authority to establish new methods of operation to provide a service equivalent to that which the railroad was already under a duty to render."

This is also an admission that the Commission did not consider the adequacy of existing service or the competitive effect of the new service in reaching its conclusions. It seems to me that this is exactly what the Commission should have considered in determining the question of public convenience and necessity.

It is evident that the two matters in which the Commission was in error are interrelated. It failed to apply the proper standards for determining the question of public convenience and necessity and, therefore, refused to hear testimony bearing upon the standard which it had rejected. These errors were not in findings of fact, which we might properly refrain from reviewing. They were errors in the application of the law which, as I see it, require that the prayer of the complaint be granted. It is possible that upon a hearing applying the proper standards by which these applications should be judged and at which all pertinent evidence is considered the Commission would still be of opinion to approve them. But until this is done the orders granting the certificates should not be allowed to stand.