In the Matter of WENDELL A. JEANPIERRE, Appellant, against WARD B. ARBURY et al., Constituting the State Commission Against Discrimination, Respondents.

First Department, May 7, 1957.

*Bruce McM. Wright* of counsel (*Thomas G. Weaver, Bernard Reswick* and *Charles T. McKinney* with him on the brief; *Weaver, Evans, Wingate & Wright,* attorneys), for appellant.

*Milton Rosenberg* of counsel (*Henry Spitz,* attorney), for respondents.

*Per Curiam.* Article 15 of the Executive Law, described as the Law Against Discrimination (§ 290), defines such discrimination in employment as constitutes an unlawful employment practice (§ 296), and establishes a procedure whereby any person claiming to be aggrieved by an unlawful employment practice may file a complaint (§ 297). One of the commissioners is then designated to investigate, and if after investigation he determines " that probable cause exists for crediting the allegations of the complaint " he will attempt reconciliation and persuasion; or, " if in his judgment circumstances so warrant " he may issue and serve notice of a formal hearing before three members of the commission, at which testimony shall be taken under oath and transcribed. After the hearing the commission is required to state its findings of fact and to issue an order to cease and desist or an order dismissing the complaint. These orders, issued after full hearings before three commissioners sitting as the commission, are the only orders mentioned in section 297.

Section 298 provides for judicial review of " such order " of the commission, upon the written transcript of the record upon the hearing. The court is given power to " make and enter upon the pleadings, testimony, and proceedings set forth in such

transcript '' an order enforcing, modifying or setting aside in whole or in part the order of the commission. The findings of the commission as to the facts are declared to be conclusive '' if supported by sufficient evidence on the record considered as a whole''. Proceedings for review are required to be instituted within 30 days after the service of the order of the commission. No provision is made for judicial review of any intermediate decisions or determinations by any single commissioner.

Pursuant to the provisions of section 297, petitioner filed a complaint alleging that the rejection of his application for employment as a flight steward with Pan American World Airways System was motivated by racial discrimination. The commissioner who investigated found no probable cause for crediting the allegations of the complaint and dismissed the complaint without ordering any formal hearing. The determination of the investigating commissioner was sustained by the commission chairman. There was no order entered, there was no testimony taken under oath, no transcript, and no findings of fact. The commissioner merely declined to call a hearing, finding no warrant for proceeding further, and he notified petitioner of that fact by letter, informing him that the primary reason for his rejection was his '' nebulous and inconsistent employment record ''.

Petitioner then commenced this proceeding under article 78 of the Civil Practice Act, seeking an order reviewing and annulling the commissioner's determination which dismissed his complaint and denied him a hearing as provided in section 297. Special Term, upon the merits, denied the application.

We are barred at the threshold from any examination into the merits of petitioner's contention that he should have been afforded a hearing by the commission on the allegations of his complaint. Section 298 of the Executive Law does not provide for judicial review of all acts of the commission, but only of such orders as are made by the commission after a formal hearing at which testimony is taken under oath. The context of the section indicates clearly that the judicial review therein contemplated does not extend to any acts or determinations of the commission not resulting in such final orders after formal hearing. The commissioner's initial determination dismissing the complaint without a hearing was not such an order, since it is undisputed that the commission did not publish findings of fact or conclusions of law, nor did it hold any hearing at which testimony was taken under oath.

Since there is no specific provision in section 298 for judicial review of the determination presented here, we next inquire

into whether it was the legislative intention to afford judicial review of such preliminary or intermediate determinations under article 78 of the Civil Practice Act, or whether the Legislature intended to limit review only to orders specified in section 298. The scope and standards of review set forth in section 298 for judicial review of the orders of the commission are those generally applicable to the review of all administrative determinations in article 78 proceedings (*Matter of Holland* v. *Edwards,* 307 N. Y. 38, 44; see, also, Report of the New York State Temporary Commission Against Discrimination which drafted the section (N. Y. Legis. Doc., 1945, No. 6, p. 33). It would be meaningless and unnecessary for the Legislature to prescribe for certain specified categories of determination the standards and procedures for judicial review contained in article 78 if it intended to allow the selfsame article 78 review for commission determinations of all types (*Matter of Guardian Life Ins. Co.* v. *Bohlinger,* 308 N. Y. 174).

Here, as in the *Guardian Life* case, there appears a careful and consistent legislative design to grant judicial review in certain specific situations and to preclude such review in others. The only possible construction of the related statutory provisions is that the express grant of the right of judicial review for certain orders bars similar review where the right has not been explicitly granted. All that is open to the courts in such circumstances is " the duty to make certain that the administrative official has not acted in excess of the grant of authority given him by statute or in disregard of the standard prescribed by the legislature " (*Matter of Guardian Life Ins. Co.* v. *Bohlinger, supra,* p. 183).

The Legislature has decreed that the initial judgment in determining whether the information disclosed by his investigation warrants a formal hearing must be exercised by the investigating commissioner alone; and that his decision is not reviewable by the courts. In making his initial determination that no probable cause existed for crediting the allegations of the complaint and proceeding with the procedures outlined in section 297, the commissioner followed the pattern prescribed by the Legislature. He may have used bad judgment in exercising his powers, and his determination may seem unsupported by the facts; but he acted within the grant of authority given him by the Legislature, and purported to apply its standards. Under the circumstances we do not reach the merits of this application, as did the court below, but we are constrained to modify the order appealed from by dismissing the petition upon these threshold considerations. No costs.

FRANK, J. (dissenting). The petitioner appeals from an order made at Special Term denying his motion in an article 78 proceeding, which sought to (a) annul and rescind the dismissal of his complaint; (b) direct a finding that the petitioner was rejected by Pan American World Airways System by reason of his race alone; (c) remit the matter to the State commission for reconsideration and for it to take the procedures provided when probable cause is found to exist; (d) obtain such other and further relief as may be proper under the circumstances.

This appeal involves what we believe to be fundamental problems concerning the State Commission Against Discrimination. The extent of its power under the Executive Law (art. 15),* the limitation upon its procedure, whether statutory or self-imposed, the finality of its order dismissing the proceeding, all these present questions which vitally affect the ability of the commission to carry out the mandate of the State in the field in which it functions.

The facts in the case are not complicated. In December, 1954, the petitioner, a Negro, applied for employment as a flight steward with Pan American World Airways. It is undisputed that neither Pan American nor any other airline operating out of New York City has ever employed a Negro in any flight capacity. Apparently the Urban League had made representations to Pan American concerning this situation and as the result thereof a number of Negroes, including the petitioner, were recommended as applicants for flight positions. When the petitioner had his first interview with Pan American, he was advised to seek other employment. It was suggested that, if hired, he might be embarrassed and made unhappy by acts of discrimination practiced by white flight personnel, many of whom were southerners; that the job was bad for one's ears; and that, in view of his linguistic aptitude, it might be more advantageous for him to obtain employment as a teacher. When the petitioner rejected these suggestions, he was interviewed by other Pan American agents.

Parenthetically, some of the reasons urged upon the applicant to discourage him in his quest for the job of his choice have been found by the commission in other cases to be of stereotyped pattern, when discrimination is practiced.

On January 19, 1955, Pan American notified the petitioner in writing that his application for employment had been rejected, because his qualifications were found not to meet those required by the company. At that time, he was not told what specific

---

* (Unless otherwise designated, the sections referred to are to be found in the Executive Law.)

requirements he lacked, although he did possess the essential facility in a foreign language.

In February, 1955, the petitioner filed a verified complaint with the commission, which was referred to Commissioner Pinto for investigation. The agency's field representative held conferences with persons employed by Pan American who informed him that the petitioner had been rejected not because of his race but because of his failure to submit a complete employment record. It should be emphasized that no such reason had been given to the petitioner. Months later and after a conference between the commissioner and some officials of the airline, the petitioner filed an amended application containing his full work history. Thereafter he was reinterviewed in June, 1955, and upon the basis of the complete work record Pan American again rejected him. The record is clear, however, that absent the questioned work record, the petitioner was otherwise fully qualified. The time lapse of more than six months between the first application and the final disapproval is significant. A person who is uncertain of being hired because of the delaying tactics of a reluctant prospective employer may be compelled, by economic necessity, to abandon his efforts and seek employment elsewhere. It is equally noteworthy that during this period the company offered the petitioner a job in a nonflight capacity, at a salary in excess of the scheduled salaries for flight employees. Apparently his previous work record was not considered as a disqualifying factor in this instance and no reason was given for the distinction made.

Following the procedure outlined in the Executive Law and the regulations for the processing of verified complaints to the point of determining probable cause, Commissioner Pinto, by letter dated October 13, 1955, notified the petitioner that the complaint was dismissed. Pursuant to the rules, the petitioner appealed to the chairman of the commission for reconsideration. The chairman affirmed the ruling of Commissioner Pinto.

As we view it, the first problem posed is whether the dismissal of the petition as affirmed by the chairman was a final determination by the commission and, if so, whether resort to the Supreme Court, either by an article 78 proceeding (Civ. Prac. Act) or pursuant to section 298 of the Executive Law, is available to the aggrieved petitioner.

The majority holds that by reason of lack of jurisdiction to review, " [w]e are barred at the threshold from any examination into the merits " and that " we are constrained to modify the order appealed from by dismissing the petition ".

We must dissent. There does not appear to be any dispute that the determination made by the investigating commissioner and affirmed by the chairman was a final order, even though in letter form. The petitioner exhausted all the remedies available to him under the internal procedures adopted by the commission (Rules Governing Prac. and Pro., rule 2, subd. k; rule 4). Insofar as the agency was concerned, it terminated the matter. (See *People ex rel. Uvalde Asphalt Paving Co.* v. *Seaman,* 217 N. Y. 70, 76; *Suppus* v. *Bradley,* 278 App. Div. 337, 339; *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, 143; *Federal Power Comm.* v. *Pacific Power & Light Co.,* 307 U. S. 156.)

We cannot accept the thesis that only an order issued by the commission after a formal hearing is subject to court review, and that the only judicial review available is under section 298, as distinguished from an article 78 proceeding. Nor does the commission take so narrow a view. It seeks not a dismissal of the proceeding, but only an affirmance of the order at Special Term. The commission argues that since its determination was without a hearing, the plaintiff must establish his "clear legal right" to the relief sought, and then asserts that its determination was not unreasonable, arbitrary or capricious. Thus it seeks an adjudication on the merits. At Special Term, the learned Justice was satisfied that judicial review was an available remedy, and considered the matter upon the merits.

The majority predicates its determination that no court review of the order is available to the petitioner upon the authority of *Matter of Guardian Life Ins. Co.* v. *Bohlinger* (308 N. Y. 174).

We do not believe that the cited case so decides. There the Court of Appeals, in passing upon the right to judicial review of section 81 of the Insurance Law (subd. 7, pars. [a], [b]) held that the Legislature had (p. 180) " Carefully and deliberately " limited judicial review to specific decisions made by the superintendent. In the instant matter no such legislative design is manifest.

Judge FULD, writing for the court, stated (p. 180) : " Although the courts will be exceedingly slow to rule that the discretion of an administrative officer or board ' may be exercised unhampered by judicial review ' (*Matter of Schwab* v. *McElligott,* 282 N. Y. 182, 186), it is settled that the Legislature may, if it sees fit, provide that certain action ' is not a matter open to [such] review '. * * * (p. 183) : That is not to say, however, that there is to be no judicial scrutiny whatsoever. Even where judicial review is proscribed by statute, the courts have the power and the duty to make certain that the administra-

tive official has not acted in excess of the grant of authority given him by statute or in disregard of the standard prescribed by the legislature. (Cf. *Matter of Barry* v. *O'Connell*, 303 N. Y. 46, 52; *People ex rel. Metropolitan Life Ins. Co.* v. *Hotchkiss*, 136 App. Div. 150.) So, here, for instance, the courts will decide whether or not the Superintendent, in reaching his conclusion, employed the standard fixed by the statute ''.

This court in the same case likewise rejected the idea that the courts could not and should not make a threshold examination as to whether the agency exercised its determination within the framework of the standards set.

We do not believe that the Court of Appeals in the *Guardian Life* case (*supra*) did, or intended to, overrule *Matter of Schwab* v. *McElligott* (282 N. Y. 182, 186) which is cited in its opinion and from which it quotes. In *Matter of Schwab* v. *McElligott*, it stated that '' In the absence of clear expression by the Legislature to the contrary, the courts may review the exercise of a discretionary power ''.

We have heretofore held that '' absent express legislative prohibition, there is inherent power in the courts to review the exercise of discretion or the abuse thereof by an administrative agency performing a quasi-judicial function '' (*Matter of McCall Corp.* v. *Gerosa*, 2 A D 2d 358, 361). The Court of Appeals has declared that it is ''the duty of the courts to set at naught arbitrary and unfounded administrative holdings.'' (*Matter of Rumsey Mfg. Corp.* [*Corsi*], 296 N. Y. 113, 118.)

Unlike its treatment of the Insurance Law and the Alcoholic Beverage Control Law, the Legislature in enacting the Executive Law did not '' carefully and deliberately '' differentiate between reviewable and nonreviewable acts and decisions of the commission. Here the Legislature did not pick and choose individual sections to provide review of some and not of others. On the contrary, it provided an omnibus judicial review section just as it did in the New York State Labor Relations Act and the Emergency Housing Rent Control Law. The legislative history of the Executive Law provisions here considered indicates that the procedure recommended was simple and self-explanatory and '' [f]urther specification can readily be supplied by the rule-making power of the agency and through the detailed provisions provided in the Civil Practive Act and in the Rules for Civil Practice applicable to proceedings of this character '' and that '' [T]he provisions for judicial review are mainly a condensation from the provisions on this subject in the State Labor Relations Act (Labor Law, § 707) and in other statutes for procedure by way of orders to cease and desist, with enforce-

ment in the courts'' (Report of Temporary Commission Against Discrimination, N. Y. Legis. Doc., 1945, No. 6, pp. 31, 32). It is a fair inference that the temporary commission was primarily concerned with the procedure to be followed for the enforcement of cease and desist orders. In interpreting section 707 of the Labor Law, the courts have held that the dismissal of a complaint is reviewable, and upon such review, considered the reasonableness of the order issued by the board (*Matter of Newspaper & Mail Deliverers' Union* v. *Kelley,* 190 Misc. 1008).

Acting under the general powers granted it (§ 295) the commission has the duty '' [T]o adopt, promulgate, amend and rescind suitable rules and regulations to carry out the provisions of this article, and the policies and practice of the commission in connection therewith.'' Pursuant thereto, it enacted rules covering '' Practice and Procedure Before Commission '' which were filed in the office of the Department of State on May 14, 1953. After providing for internal appeal (rule 2, subd. k; rule 4) the commission enacted subdivision a of rule 13 which states that: ''Any complainant, respondent or other person aggrieved by an order of the commission may obtain judicial review thereof ''. The rule is not limited to orders after hearing. While not binding upon the courts, great weight should be accorded to the agency's interpretation of statutes (*Leighton* v. *Bearman,* 278 App. Div. 72, affd. 302 N. Y. 865).

In addition to the difference in legislative history, there is a fundamental distinction between the functions of the Superintendent of Insurance and the respondent. Benjamin (Administrative Adjudication in the State of N. Y., vol. 1, pp. 49–50) points out the difference between the former and the Labor Relations Board: '' the Insurance Department [is engaged] in the continuing regulation of a field of industrial or business activity * * *. The functions of the present Labor Relations Board are not administrative in the same sense. The machinery set up by the Labor Relations Act for the enforcement of the rights conferred * * * is essentially the machinery of litigation and adjudication.'' If the name of the subject agency were substituted for that of the labor board, the analysis becomes particularly cogent here.

Assuming that the determination in *Guardian Life* v. *Bohlinger* is to be applied here, what are the criteria created by the law, by which the commission is to be guided and which the courts must consider in determining the propriety of the agency's action? The Constitution of the State of New York sets the standard. In 1938, a new section was added to its Bill of Rights (art. I, § 11), which provides, '' No person shall be denied the equal

protection of the laws of this state or of any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.''

The need for engraving such a declaration upon the keystone of our law undoubtedly stems from the recognition that '' Each case of denial of rights to an individual * * * may seem to be relatively unimportant, but we know now, more surely than ever before, that callousness to the rights of individuals and minorities leads to the barbarism and the destruction of the essential values of civilized life.'' (*People* v. *Barber,* 289 N. Y. 378, 386.)

Indeed, long before section 11 of article I was adopted, laws prohibiting discrimination against Negroes were upheld (*People* v. *King,* 42 Hun 186 [1886], affd. 110 N. Y. 418), but were found to be ineffectual in eradicating the evil.

When the commission was created (L. 1945, ch. 118) the Legislature declared that '' [T]he opportunity to obtain employment without discrimination because of race, creed, color or national origin is hereby recognized as and declared to be a civil right '' (§ 291). Because the problem was of such vital '' state concern '', the agency was created by the exercise of the State's sovereign police power (§ 290).

The difficulties attendant upon the establishment of the necessary proof to determine whether there is a violation of the constitutional and statutory standard have been heretofore recognized. This court in *Matter of Holland* v. *Edwards* (282 App. Div. 353, 359) said: '' All this, in the end, turns upon how facts are evaluated and how they are seen in correlation with each other. Discrimination in selection for employment based on consideration of race, creed or color is quite apt to be a matter of refined and elusive subtlety. Innocent components can add up to a sinister totality.''

The Court of Appeals, in affirming (307 N. Y. 38, 45) observed that, '' [o]ne intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive — for we deal with an area in which ' subtleties of conduct * * * play no small part '.''

It is within this frame of reference, that we believe that the duty devolves upon the court to examine the record in order to decide whether the action taken by the commission should be sustained.

We now pass to a consideration of the merits in this controversy. In order to establish '' probable cause to credit the allegations of a complaint,'' there is no requirement to prove the facts to a moral certainty, or beyond a reasonable doubt, or even by a preponderance of the evidence. In *Carl* v. *Ayers* (53 N. Y. 14, 17) it was said, '' Probable cause　＊　＊　＊　is defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in his belief that the person accused is guilty of the offense with which he is charged.'' To like effect see Ballentine (2d ed., p. 1020) on definition of '' probable cause '', and Black's (4th ed., p. 1431) definition of '' reasonable and probable cause ''.

In his letter of October 13, 1955, dismissing the petition, the commissioner stated in part as follows, '' I have concluded that the evidence is insufficient to warrant a finding that you were rejected because of your race and color. ＊　＊　＊　As the respondent does not employ any negro stewards or stewardesses, there is some suspicion that they are not acceptable in such positions. ＊　＊　＊　The Commission has repeatedly held that the mere absence of certain racial or religious groups on the employment rolls of an employer is not in and of itself sufficient evidence on which to predicate a finding that representatives of such groups are barred from employment. Under the circumstances, I am constrained to hold that probable cause does not exist to credit the allegations of your complaint.''

However correct the commissioner's statement may be that the failure to employ certain racial or religious groups is not in and of itself sufficient to predicate a finding of probable cause, it is not correct to assume that the investigation disclosed nothing more. The record discloses that, in addition to the failure to employ Negroes in flight capacities, a definite attempt was made to discourage the petitioner's efforts because of his color. He was given no reason for his first rejection. Only after the intervention of the commission, did Pan American for the first time state that the complainant had been rejected because his work record was incomplete. When the information was supplied, the second rejection was based upon the ground that petitioner's frequent changes of employment made him undesirable. At the same time, two white men were hired although one had held 11 jobs in seven years and the other had a similar record of frequent job changes. The only difference was that the petitioner was a Negro.

Of course, Pan American through its agents denied discriminating against this petitioner and denied a general policy of excluding Negroes in flight capacities, although in the Atlantic

division alone it employs more than 300 stewards and steward-esses. To explain the absence of Negroes in this group, it was stated that only three applications (including the petitioner's) had been filed by Negroes. To buttress the assertion, the respondent produced the documents. We cannot determine from the record whether application forms are filled out before or after the preliminary interviews. If the latter be the case, then there is no way of determining how many Negroes may have been rejected before the forms were supplied. The assertion that only three such persons had applied would then be wholly unsupported by documentary proof.

The commission, all too familiar with the pattern adopted by employers to avoid the charge of discrimination, has by its own procedure created a standard which complies with the purpose of article 15 of the Executive Law. It has found probable cause upon facts less persuasive than exist here. In the subjoined footnote, we cite some cases taken from the annual reports filed and published by the commission to demonstrate the standard adopted by the agency.

We believe from the record that there is more than a mere suspicion that a policy of systematic exclusion of Negroes from flight personnel existed and that probable cause to credit the complaint was actually found. It will be noted from section 297 that in such event the investigating commissioner " shall immediately endeavor to eliminate the unlawful employment practice complained of by conference, conciliation and persua-sion." Here, Commissioner Pinto did just that.

On May 25, 1955, the commissioner held a conference attended by four officials of Pan American World Airways System. He apparently accepted the bare statement that only two other Negroes had applied for flight service and the three cases were discussed. He made no further inquiry as to the rejection of others or what means were available to ascertain how many Negroes had applied. A colloquy then ensued concerning general company policy. It is patent that Pan American had considered the employment of Negroes in flight capacities but had rejected the idea because " much of the flight personnel are southerners, and the nature of the job requires these people to be brought together intimately, not only on the planes but at foreign stations throughout the world where they share the same hotels together. * * * this could be a prime problem in employee relations. * * * [and] negro flight personnel would have a very bad time on flights going to South Africa."

The investigating commissioner made efforts to conciliate and persuade, and arranged for subsequent conferences with other

company officials. Since these activities, under the statute, can only follow a finding of probable cause, the conclusion is inescapable that probable cause did exist and that the commission erred in dismissing the complaint.

There is another cogent reason why the courts should set aside the final order in this proceeding and remit the matter, a reason which goes far beyond the petitioner's individual problem.

We are of the view that the orders issued by the commission under the power granted it by the Executive Law, as confirmed by the courts (see *Matter of Holland* v. *Edwards,* 307 N. Y. 38; *Matter of Castle Hill Beach Club* v. *Arbury,* 2 N Y 2d 596) clearly establish that the commission has two major functions. The first is to entertain, consider, investigate and determine a complaint filed by an individual and make such order with respect to that individual as is reasonable and proper under the circumstances; the second, and we deem it the more important, is to determine whether an over-all pattern of systematic exclusion or discrimination exits, either in the total operation of an employer or throughout an industry, and if so, to make appropriate orders.

It is a matter of public record that for several years the commission has sought legislation to give it the power to file its own complaints. It could then initiate a proceeding which could result in the issuance of a cease and desist order. Although bills have been introduced for that purpose, the legislation has failed of passage.

While it has the authority to make studies and investigate, the commission has no power, in the absence of a verified complaint and a finding of probable cause, to hold a hearing or thereafter to issue a cease and desist order. (See article by the general counsel to the commission, N. Y. L. J., April 6, 1951, p. 1246, col. 1.) Without a complaint, no controversy exists (*Ivory* v. *Edwards,* 278 App. Div. 359).

In a letter dated October 17, 1955, addressed to Pan American, Commissioner Pinto advised the respondent of the dismissal of the complaint against it, and stated that on the aspect of " over-all employment practice and policy " the investigation would continue. That assertion was meaningless insofar as the power of the commission was concerned to hold a hearing and, if satisfied that a policy of discrimination existed, to issue a cease and desist order. Having dismissed the complaint it had stripped itself of the power to make or enforce any order.

Even assuming *arguendo,* that it was justified in finding that no probable cause existed with respect to the petitioner's charge

as it concerned him individually, the complaint should not have been dismissed, for it contained a charge of a general discriminatory policy.

The record discloses that Pan American, after consideration of the problem, decided that it was inadvisable for it to employ Negroes in its flight service. Whether it reached that conclusion after intensive soul searching or whether the decision was reluctantly reached as the most convenient labor policy available, it was nonetheless a violation of the Executive Law (§ 296, subd. 1, par. [a]). The law and the policy of the State require the commission to proceed upon a complaint where probable cause exists. It may not avoid the full discharge of the duty imposed upon it because compliance may prove embarrassing, distasteful, or even troublesome to an employer. By conferences and orders, the commission solved just such a situation involving employers and labor unions in the brewing industry (*Workman* v. *Bottlers & Drivers Union,* 1955 Annual Report, pp. 94–97).

In this case, Special Term indicated that " there are several suspicious circumstances * * * that perhaps the petitioner was rejected because of his color, which at least would require further inquiry ". So properly concerned was the learned Justice, that he conferred with the chairman of the commission who assured him that the investigation would be continued " with a view to determining whether there is a concerted policy on the part of the airlines to exclude Negroes " from flight positions. The statement, even if made with the best intentions, was misleading, for assuming such a concerted policy were found, no hearing and no order could follow.

The commission has the power, in a proper case, to dismiss so much of a complaint as charges discrimination against the individual complainant, yet to sustain the allegation which charges discrimination as a general employment policy. In a series of articles in the New York Law Journal, the commission's general counsel cited a proceeding as authority for this proposition. (N. Y. L. J., April 12, 1951, p. 1326, col. 1.)

In the article he described a case in which the agency took such action when a Negro applicant for a job as a bus driver filed a complaint charging discrimination personally and as a general policy. Although the applicant was disqualified because he was over the age for employment, the complaint charging overall policy was sustained, and the procedure provided after the finding of probable cause was followed.

That the filing of a verified complaint is vital to enable the commission to obtain jurisdiction, is best evidenced by section

297 which permits amending the petition, and by the rules and regulations (rule 2, subds. i, j) of the commission which prohibits the withdrawal of a complaint except upon the written consent of one or more commissioners. The annual reports contain numerous cases where the commission refused to permit withdrawals. The reason is obvious. The withdrawal of a complaint strips the commission of its power to enforce its mandate.

For all of the reasons herein stated we must hold that the petitioner established a clear legal right for judicial review. We are satisfied that the action taken by the commission was not in accordance with the standards set by law, and we hold that the dismissal of the complaint was an improvident exercise of discretion and was arbitrary, capricious and unreasonable.

We believe that upon the facts, this case falls within the ambit of Chief Judge Conway's language in the *Castle Hill Beach Club* case (2 N Y 2d 596, *supra,* p. 608) where he said: '' The various aspects of a plan or scheme, when considered singly, may very well appear innocent. The true nature * * * is revealed only when the various aspects are viewed as a totality. Such is this case.''

The complaint should be reinstated and a finding of probable cause to credit the allegations made. Such a determination does not require the issuance of a cease and desist order. It does require that the conciliation and conference method be followed as the next step in the procedure. Failing that, the investigating commissioner may then direct that a hearing be held. We are not here concerned with the determination that may follow such a hearing, although from this record it would appear that a hearing, at least upon the general employment policy of Pan American, is called for, in the event that conference and conciliation prove unavailing.

The order of Special Term should be reversed, the complaint reinstated and the matter remitted to the commission for further action consonant with the views herein expressed.

## FOOTNOTE

There are many other cases cited in the Annual Reports which demonstrate the standard set by the commission for a finding of probable cause. They are omitted here, first, for brevity, and second, because there is no statement *in haec verba* of a finding of probable cause although the procedure adopted could only follow such a determination.

(1) A factory employed 223 persons, not one of whom was a Negro. A Negro complainant charged in her complaint that she was refused employment because of her color. The complaint charged that although she was the first

to respond to the employer's help wanted advertisement, she was turned away with the excuse that a number of applicants had already been hired and no more vacancies existed. The employer's manager conceded that the complainant was well qualified, but that he had "overlooked" her application. A finding of probable cause was made. It should be noted that the investigating commissioner determined that the fact that no other Negroes were employed, standing alone, is not conclusive, but when considered with the other circumstances the finding of probable cause was justified. (*Williams* v. *Kerk Guild Prod. Corp.*, 1954 Report of Progress, pp. 49, 50.)

(2) A Negro woman applied to the supervisor of the coffee shop in a hotel for a position as a waitress, pursuant to a newspaper advertisement and was informed that no jobs were available at the time and that the purpose of the advertisement was to obtain a list of qualified persons for the future. The investigation disclosed that the hotel's coffee shop had been customarily staffed with white waitresses although Negroes were employed in other capacities. In determining that probable cause existed to credit the allegations of the complaint the investigating commissioner found, "It seems clear that there has been in existence for a long time a pattern of employment for the position of waitress in the coffee shop which discriminates against negroes. In the light of the facts in this case, protestations of freedom from bias failed to carry conviction and remind one of the adage that 'actions speak louder than words.'" (*Hardy* v. *Schenectady Hotel Co.*, 1954 Report of Progress, pp. 52, 53.)

(3) A verified complaint filed by a Negro woman charged discrimination because of color. She had been denied employment at the Westchester branch office of an insurance company where she had applied for a secretarial position. It appeared that no Negro had ever been hired in any capacity, although a substantial number of Negroes had presented themselves and the branch office staff was comprised of approximately 300 persons. A finding was made by the investigating commissioner that probable cause existed to credit the allegations of the complaint. (*Sellers* v. *Allstate Ins. Co.*, 1955 Report of Progress, p. 50.)

(4) A Negro railroad worker applied to the Long Island Railroad Company for employment, on three separate occasions. Each time he was told that no one was being hired. He filed a complaint charging discrimination because of color. After investigation, probable cause to credit the allegations of the complaint was found. In making that finding the investigation commissioner stated in part, "Standing by themselves the facts herein leave doubt as to whether there was probable cause to credit the allegations of this complaint. However, in no case can the facts be examined in a vacuum. The review of the employment pattern of the respondent * * * indicates that negroes have been systematically excluded from employment in responsible positions. At the time of the investigation of this complaint there were no negro trainman nor others of the negro race in responsible positions with respondent, and the total picture is one which could be brought about only by traditional racial discrimination long persisting." (*Willis* v. *Long Is. R. R. Co.*, 1955 Report of Progress, pp. 88, 89.)

(5) Probable cause was found where a textile manufacturer with a labor force of 700 persons employed only one Negro. The employer asserted that the failure to employ Negroes was based upon the objection of other employees. (1948 Annual Report, Case #3, p. 32.)

(6) Probable cause to credit the allegations of a complaint was found in a case where the complainant charged that she had been refused employment as a telephone operator because of her color. The complainant never received the

mental aptitude test or the physical examination usually given to applicants by respondent. The contention of the respondent that the complainant was not hired because the respondent gave preference to applicants who did not have small children was rejected. (*Woodley* v. *Upstate Tel. Co.*, 1949 Annual Report, p. 33.)

(7) Probable cause was found to exist where an employer was charged with having refused to hire complainant as a machine cutter because of his color. The respondent took the position that the foreman had rejected the complainant because he was not a union member rather than because of his color. Upon investigation it was found that the shop was one where the employer is permitted to hire anyone provided the non-union worker joins the union within 30 days after hiring. (*Berry* v. *Rockland Sportswear Co.*, 1951 Annual Report, p. 62.)

(8) Probable cause was found where a Negro complainant alleged that when he applied for an advertised position for which he was qualified, he was advised that he could not be considered because the position in question entailed supervision over white girls. (*Fields* v. *Will-mark Service System*, 1950 Report of Progress, p. 59.)

(9) Probable cause was found to exist when an employer informed an applicant for a position as general office worker that he would not want to expose her to expressions of anti-semitism from some of the employer's wealthy clients. In disposing of the case, it was held, "An employer must not let his consideration of an applicant be altered" because the applicant might be subject to hearing discriminatory remarks. (*Salston* v. *Previews, Inc.*, 1952 Annual Report, p. 29.)

(10) A finding of probable cause was made where a Negro claimed he was refused employment because of his color. The respondent explained the failure to employ on the ground that its store was located in the Stuyvesant Town area of New York City where tension had developed involving the presence of Negro tenants. (*Sawyer* v. *Whelan Drug Co.*, 1953 Report of Progress, p. 39.)

(11) Probable cause was found in a case in which the complainant whose full name was Joan Cogan Finkelstein was hired under the name of Joan Cogan. When she appeared for work and presented her birth certificate which contained her full name, she was told that her hiring was a mistake because the position had been filled prior thereto. (*Finkelstein* v. *G. R. Kinney & Co.*, 1952 Annual Report, p. 44.)

(12) Probable cause was found where a colored applicant for a clerk typist position was prevented from seeing the interviewer for two and a half hours by the receptionist, who falsely stated that the interviewer was out of the office (actually the interviewer was in the office). (*Barnes* v. *Newark Elec. Co.*, 1949 Report of Progress, p. 34.)

PECK, P. J., BREITEL and BOTEIN, JJ., concur in *Per Curiam* opinion; FRANK, J., dissents and votes to reverse in opinion, in which RABIN, J., concurs.

Order modified in accordance with the opinion herein and, as so modified, affirmed, with $20 costs and disbursements to the respondents.