**HOME TRANSPORTATION COMPANY, INC., Plaintiff,**

v.

**UNITED STATES of America and the Interstate Commerce Commission, Defendants,**

**and**

**National Trailer Convoy, Inc., et al., Intervening Defendants.**

**Civ. A. No. 17966.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Oct. 31, 1973.

Robert E. Born and J. Michael May, Atlanta, Ga., for plaintiff.

John H. D. Wigger, Atty., Dept. of Justice, Thomas E. Kauper, Asst. Atty. Gen., Anti-Trust Div., Dept. of Justice, John W. Stokes, Jr., U. S. Atty., Julian M. Longley, Jr., Asst. U. S. Atty., James F. Tao, Atty., I. C. C., Washington, D. C. for defendants.

Robert E. Michelson and William J. Lippman, Singer & Lippman, P. C., Washington, D. C., Paul D. Borghesani, Elkhart, Ind., Guy H. Postell, Postell & Hall, Atlanta, Ga., for Morgan Drive Away, Inc., intervening defendant.

Leonard A. Jaskiewicz and Ira G. Megdal, Grove, Jaskiewicz & Gilliam, Washington, D. C., Richard O. Battles and Fred Rahal, Jr., Tulsa, Okl., Bates Block, Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for National Trailer Convoy, Inc., intervening defendant.

Mitchell King, Jr., Greenville, S. C., Clyde W. Carver, Atlanta, Ga., Wilmer B. Hill, Ames, Hill & Ames, Washington, D. C., for Transit Homes, Inc., intervening defendant.

Before MORGAN, Circuit Judge, EDENFIELD and O'KELLEY, District Judges.

EDENFIELD, District Judge:

Plaintiff Home Transportation Company, Inc. [hereinafter "Home"] brings this action to enjoin and set aside the decision and order of the Interstate Commerce Commission which denied in substantial part Home's application for a certificate of public convenience and necessity under 49 U.S.C. § 307.[1] A three-judge district court was convened as provided in 28 U.S.C. § 2325 and the case came on for hearing on August 1, 1973. Plaintiff is actively opposed in this action by the Commission and by three intervenor-defendants: National Trailer Convoy, Inc., Morgan Drive Away, Inc., and Transit Homes, Inc., all of whom were protestants to Home's application in the proceedings before the Commission.

## I. BACKGROUND AND PROCEEDINGS BELOW

Home Transportation Company is a Georgia corporation which has been involved in interstate "heavy hauling" since 1946. In 1948 Home received a permit, later converted to an ICC certificate, authorizing it to carry "buildings, complete, knocked down or in sections," under which it transported prefabricated buildings on flatbed trailers, destined for use as low-cost housing to satisfy the post-war housing shortage. Whereas transportation of pre-fab houses under this certificate accounted for 90% of Home's business prior to 1950, by 1955 such carriage had dwindled to 10% of the company's operations.[2]

In 1967 Home began transporting "mobile homes" on the strength of a

1. Section 307 of Title 49, U.S.C., provides in relevant part: ". . . [A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied . . . ."

2. Report of the Hearing Examiner, No. MC–111545 (Sub-No. 143), at 7 [hereinafter "Report"].

1967 Illinois three-judge district court opinion, later reversed in 1971, which it interpreted as allowing it to transport mobile homes under its existing certificate authorizing the carriage of "buildings." While continuing to operate under a "color of right", claimed to be emanating from the existing certificate, Home filed an application with the ICC on July 27, 1970 formally seeking a certificate of public convenience and necessity "authorizing operation in interstate or foreign commerce as a motor carrier, over irregular routes, of trailers designed to be drawn by passenger automobiles,[3]

> (1) between points in Alabama, Florida, Georgia, Louisiana, Mississippi, and South Carolina, and

> (2) between points in the said States, on the one hand, and on the other, points in Arkansas, Delaware, Kentucky, Missouri, North Carolina, Pennsylvania, Tennessee, Texas, Virginia, West Virginia, and the District of Columbia." [4]

In proceedings before the Commission, commencing April 5, 1971, Home presented a "three-fold factual and legal proof" in support of its application. First, it argued that under the 1967 decision of the three-judge panel in Pre-Fab Transit Co. v. United States, 262 F.Supp. 1009 (S.D.Ill.1967), Home had reasonably believed that it was authorized to transport mobile homes, and that its very extensive operations over the three-year period from that date, conducted under a color of right, should be admitted as "proof of public convenience and necessity for continuation of such operations under a properly conformed certificate."

Second, Home relies on the so-called "field of service" doctrine, arguing that the present "mobile home" is an evolu-tionary descendant of the earlier prefabricated building, and that its existing certificate authority ought to be expanded to allow it to keep pace with the technological change which has occurred in the industry which it was originally authorized to serve.

Third, Home presented approximately 45 public witnesses to testify as to their current needs and interest in the continued availability of Home's service for the transportation of "mobile homes." These witnesses included shippers who had used Home's services in the past and had found them superior to other licensed carriers, as well as shippers and dealers who were dissatisfied with the existing service.

The Hearing Examiner rejected the "field of service" theory proposed by plaintiff as being contrary to the actual development of the mobile home industry from the earlier and continuing manufacture of smaller recreational trailers capable of being towed by passenger vehicles. He also was unpersuaded by Home's claim that its carriage of mobile homes since 1967 had been performed under a "color of right" and that its past operations were therefore entitled to be considered as evidence favorable to its application.

Rejecting one theory and ignoring plaintiff's service in the field from 1967 to date of application, the examiner devoted the bulk of his 53-page report to analyzing the testimony of plaintiff's supporting shippers and the opposing evidence presented by the protestant carriers, National Trailer, Morgan Drive Away, Transit Homes and Chandler Trailer Convoy. On the basis of this evidence the examiner found that more competition was needed for carrying mobile homes in initial movements from points in Georgia and Alabama to other

---

3. The phrase "trailers designed to be drawn by passenger automobiles" is the formal terminology used by the ICC in describing "mobile homes", and in no way reflects reality. Most "mobile homes", now designed to be used as permanent living quarters, are far too large to be pulled to their ultimate destination by the average passenger car, and require instead special trucking equipment such as that provided by plaintiff and defendant-intervenors to this action.

4. Report, 2.

points in "Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, and those in Louisiana on and east of the Mississippi River."[5] He concluded, however, that the evidence did not justify the granting of authority for "secondary movements", *i. e.*, subsequent transportation of mobile homes which had already reached their initial dealer destination from the manufacturer, and that plaintiff had failed to demonstrate a need for increased carriage into the states of Arkansas, Delaware, Kentucky, Missouri, North Carolina, Pennsylvania, Tennessee, Texas, Virginia, and the District of Columbia.

The decision and recommendation of the hearing examiner were affirmed and adopted by Division 1 of the Commission on October 10, 1972, and on February 27, 1973 Division 1, acting as an appellate division, denied the petitions for reconsideration filed by plaintiff and protestants, and affirmed its order. As slightly modified by Division 1, the authority recommended by the examiner and set forth in the certificate of public convenience and necessity which has since been issued to plaintiff, reads as follows: .

> "Operation by applicant, in interstate or foreign commerce, as a common carrier by motor vehicle, over irregular routes, of trailers designed to be drawn by passenger automobiles, in initial movements (1) from points in that portion of Alabama on and north of U.S. Highway 78, to points in Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, and points in that portion of Louisiana on and east of the Mississippi River, and (2) from points in Georgia, to points in Alabama, Florida, Mississippi, North Carolina, South Carolina, Tennessee, and points in that portion of Louisiana on and east of the Mississippi River."

It is from the Commission's denial of the balance of the authority requested (generally, secondary authority and transportation to states out of the Southeast) that plaintiff brings this lawsuit.

## II. SCOPE OF REVIEW OF COMMISSION DECISIONS

There is no disagreement among the parties that the function of the court in reviewing a decision of the Commission is a limited one. While several formulations of varying lengths are possible, a reasonably straightforward guide is set forth by the three-judge court in Subler Trucking, Inc. v. United States, 313 F. Supp. 971, 979–980 (S.D.Ohio 1970), as follows: "The scope of this Court's review is limited to a determination of whether the Commission's orders are within the scope of its authority and are based upon adequate findings which are supported by substantial evidence on the record as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). When there is a rational basis for the decision of the agency, the decision must be upheld even though the court might reach a different result upon the same evidence. Rochester Telephone Corp. v. United States, 307 U.S. 125, 138–140, 59 S.Ct. 754, 83 L.Ed. 1147 (1939) [other citations omitted]."

In Consolo v. Federal Maritime Commission, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), the Supreme Court defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . [Citations omitted.]"

Additional guidance in applying the proper standard of review may be found

---

5. Report, 52.

in the general proposition that "An order of the Interstate Commerce Commission carries with it a presumption of validity, and unless there is clear evidence to the contrary it must be presumed that the Commission has properly performed its official duties." King Van Lines v. United States, 220 F.Supp. 551 (D.C. Kan.1963).

In general, the Commission's decision is this case may be reversed only if it is determined that there is no substantial evidence to find that plaintiff failed to prove that it was in the interest of the present or future public convenience and necessity for an additional carrier of mobile homes to operate from and to those places set forth in its application. Specifically, plaintiff has presented three grounds on which, it is argued, the Commission's decision and order should be enjoined.

## III. PLAINTIFF'S GROUNDS FOR ENJOINING ORDER OF THE COMMISSION

A. The Commission's refusal to consider plaintiff's prior operations was arbitrary and without rational basis.

The general proposition upon which this argument rests is that "evidence of prior unauthorized operations should be considered in determining public convenience and necessity where such operations were undertaken under color of right or in good faith belief that they were authorized." Zuzich Truck Lines, Inc. v. United States, 224 F.Supp. 457, 468–469 (D.Kan.1963). The corollary to this proposition is that where prior unauthorized operations cannot be said to have been performed under a color of right, they cannot be considered as evidence of public convenience and necessity. King Van Lines, Inc. ·v. United States, *supra*, 220 F.Supp. at 555, Zuzich Truck Lines, Inc. v. United States, *supra*.

■ In the present case, Home argues, first, that the Commission's refusal to consider evidence of prior operations could not have been based on a finding that the operations were not in good faith or conducted in callous disregard of the law. No such finding could be made, the plaintiff reasons, because the operations were conducted openly and notoriously and the "Commission knew that they were being conducted for several years while the issue was pending through legal channels." To this argument need only be said that "notoriety" or absence of prosecution are not determinants of legality, and that for an applicant to have prior unauthorized operations considered as evidence of fitness, the operations must of necessity be brought to the attention of the Commission. Whether the operations will or will not be accepted as evidence is then a determination to be made by the Commission.

Home's principal argument in support of its claimed "good faith" conduct is that in expending its operations into the mobile home field it relied upon the decision of the three-judge panel in Pre-Fab Transit Co. v. United States, 262 F. Supp. 1009 (S.D.Ill.1967) (hereinafter *"Pre-Fab* I"). From plaintiff's brief to the present action, it would appear that Home relied more on a West Key Note abstract to the case than it did on the opinion itself. Note number "5" to the opinion, captioned "Commerce [Key No.] 85.28(4)" reads as follows: "Where motor carrier's certificates contained commodity descriptions of 'prefabricated buildings, complete, knocked down or in sections' and 'buildings, complete, knocked down, or in sections' carrier had authority to transport mobile homes." This abstract is a purported distillation of several hundred words which *could* be so interpreted. At page 1012 of the West Reporter, Judge Major, Senior Circuit Judge, complains for several paragraphs that in order for the Commission to bar Pre-Fab from transporting mobile homes under the authority granted in its existing certificate for transporting "buildings", it would have to arbitrarily eliminate the word "complete" from its certificate. "This, is in effect and in fact," states Judge Major, "con-

stitutes a modification of the authorities issued to plaintiff which is not permissible under the pretext of interpretation." At 1012–1013.

While it can be reasonably argued that the words of Judge Major, as described above and set out more fully in the margin,[6] stand for the proposition that mobile homes may be transported under a "buildings" certificate, it is also true beyond question that Judge Major's remarks were dicta. The court in *Pre-Fab* reversed the Commission's order preventing Pre-Fab from transporting mobile homes on the express grounds that the report of the examiner on which the Commission relied "contained no findings relevant to the material issue for decision", and that reliance for support by the Commission on its previous orders was "lacking in rational basis." Read in its entirety, the opinion in *Pre-Fab* I expressed doubt over the Commission's right to interpret a certificate authorizing the carriage of "complete buildings" so as to prevent the holder of such a certificate from transporting mobile homes, but specifically reversed the Commission for its failure to meet the essentially linguistic arguments of plaintiff Pre-Fab, or come up with any rational, independent decisional basis of its own. The decision was, in the words

of the court, "annulled and set aside, leaving to the Commission any further action which it may deem appropriate." At 1016.

Whether Home's reliance on the dicta in *Pre-Fab* I was in "good faith", the court need not decide for purposes of this action. The relevant question here is whether the hearing examiner's conclusion, that the totality of Home's unauthorized operations was not in good faith, is supported by "substantial evidence." In his report, the examiner himself did not condemn outright Home's reliance on *Pre-Fab* I. Rather, he considered Home's reliance on this arguably weak precedent as one factor among several indicating that Home's post-1967 operations were not conducted in good faith. Other indicia mentioned by the examiner include the following:

(1) Plaintiff made various inquiries to the Commission as to the interpretation to be given to its "buildings" certificate, but that plaintiff did not feel that it could transport mobile homes until after the 1967 decision in *Pre-Fab* I. In its brief, the Commission elaborates on this point, with citation to the transcript of the hearing, and states that on three separate occasions prior to 1967 (1951—Tr. 67; 1955—Tr. 49–50, 66–67; "several years after that"—Tr. 67)

6. "The government on brief states, 'The crux of the matter before this Court is whether there is a rational basis for the Commission's conclusion that plaintiff's commodity description "prefabricated buildings, complete, knocked down, or in sections . . ." does not authorize the transportation of single unit mobile homes.' The government further states, 'A reading of the Commission's report in this case discloses the clear, and understandable rationale in its disposition of the case.'

"With this reasoning we do not agree. On the record made there is no finding, conclusion or reason stated which furnishes any support to the order. At no place in the proceedings, including the report, was there an allegation or even a claim that the language of plaintiff's authorities was ambiguous. . . . The plain fact . . . is that the language employed is so free from ambiguity that all who read it can understand. There is no room for the belief that when plaintiff's certificates

were issued a commodity was intended other than that so plainly described. It is evident . . . that the author of such was skilled in the use of language . . . . This is shown not only by the certificates here involved but by numerous others which were issued to plaintiff. Illustrative is the authority issued August 10, 1956, . . . 'Prefabricated metal grain storage buildings, set up, knocked down, or in sections.' Consistency with the so-called rationale of the instant case would require that this authority be restricted to storage buildings only if knocked down or in sections. This could be accomplished, however, only by the elimination of the words 'set up' in the same fashion that the word 'complete' has been eliminated in the instant situation. This in effect and in fact constitutes a modification of the authorities issued to plaintiff, which is not permissible under the pretext of interpretation. . . ." At 1012–1013.

plaintiff "was informed by Commission personnel that it was not authorized to move trailers."

(2) The Commission has consistently maintained the position that authority to transport "trailers" and that for "buildings" are mutually exclusive, and. that Home was well aware of that position. In 1965 the policy of mutual exclusivity was upheld by the panel in National Trailer Convoy, Inc. v. United States, 240 F.Supp. 286 (N.D.Okl. 1965), and with notice of this contrary court opinion, Home had no right to rely on the decision in *Pre-Fab* I, which merely remanded the case to the Commission for further proceedings.

(3) Following the decision in *Pre-Fab* I the Commission reconsidered the application of Pre-Fab in extensive hearings, and on April 28, 1970 affirmed its earlier decision to deny Pre-Fab authority to transport mobile homes. This decision, sub nom. Mobile Homes Between Points in the United States, 337 M.C.C. 111 (April 28, 1970), was followed by two others, National Trailer Convoy, Inc. Extension—Lancaster County, S.C., 112 M.C.C. 95 (Aug. 28, 1970), and Morgan Drive Away, Inc., Extension—Harnett County, N.C., 112 M.C.C. 392 (Oct. 27, 1970), in which Home Transportation was specifically mentioned as being one of those carriers not authorized to transport mobile homes. Yet, in spite of such a clear statement of Commission policy, the hearing examiner found, Home continued its operations. Its failure to cease operations in the face of these decisions, plus Home's formal application to the ICC on July 27, 1970, for authority which it already claimed to possess by virtue of its "color of right", were considered by the examiner to be evidence that Home's conduct was not in good faith.

(4) Finally, even after *Pre-Fab* I was reversed in January 1971 by the same panel which had originally entered the decision, Pre-Fab Transit Co. v. United States, 321 F.Supp. 1147 (S.D.Ill.1971) (hereinafter "*Pre-Fab* II"), Home continued transporting mobile homes until March 1971 when it became evident that no appeal would be taken.

Against these indicia of "bad faith" Home first makes the argument that it relied on an authoritative opinion of a three-judge district court, and that taking the court to be the final arbiter of the dispute, it had no reason to curtail its operations until that decision was finally set aside. Second, Home argues that it was not the only carrier who relied on *Pre-Fab* I as authority to transport mobile homes. Plaintiff notes that in Griffin Mobile Home Transporting Co., Extension—Claremore, Okl., No. MC–116887 (Sub-No. 2) (Dec. 26, 1968), Morgan Drive Away, Inc. opposed Griffin's application in part on the basis that it already possessed authority for supplying the need in question under its certificate for transporting prefabricated buildings, relying on *Pre-Fab* I. Nowhere in that decision does it appear, however, that Morgan's argument of existing authority, used in opposing the application of a rival carrier, was ever adopted by the Commission. Third, Home attempts to equate the circumstances here with those obtaining in Atlanta-New Orleans Motor Freight Co. v. United States, 155 F.Supp. 68 (N.D.Ga. 1953), Bowman Transportation, Inc. v. United States, 211 F.Supp. 354 (N.D. Ala.1962), and W. T. Mayfield Sons Trucking Co. v. United States, 211 F. Supp. 619 (N.D.Ga.1962). Those cases are readily distinguishable from the instant case, and they do not assist plaintiff's argument that the facts of this case show that its prior unlawful operations were conducted in good faith. Finally, Home notes that two of the twelve commissioners dissented in *Mobile Homes Between Points in the United States, supra,* and that Judge Poos dissented· to the majority's opinion in *Pre-Fab* II, reversing *Per-Fab* I.

■ It is not a frivolous argument that Commission policy prior to and after *Pre-Fab* I was entitled to little weight, in the face of a decision criticizing that policy, and that Home's application for a certificate of convenience and

necessity was made merely to formalize authority it considered it already enjoyed. Were the issue of Home's good faith a question of first impression to be decided by the panel, a finding that Home acted in good faith could be reasonably made. As stated previously, however, that is not the question here. From the hearing examiner's report it appears to the court that there is present "substantial evidence" to sustain the Commission's position that Home's operations subsequent to 1967 were not conducted in good faith, and were therefore not entitled to be considered as evidence in support of its application.[7]

B. The rejection of the "Field of Service" doctrine was arbitrary, capricious, without rational basis and contrary to law.

■ The "Field of Service" doctrine is a policy developed by the Commission which allows carriers "to keep apace of technological changes and new product developments in their specialized service industry." Transit Homes, Inc. v. United States, 299 F.Supp. 950 (D.C.S.C. 1969). The leading decision in this area is a motor carrier case affirmed as A. B. & C. Motor Transportation Co. v. United States, 151 F.Supp. 367 (D.C.Mass. 1956). There, a carrier which had authority to transport wool and certain wool products, applied for authority generally to carry textile mill products and supplies, with certain exceptions. The Commission found that the carrier had in the past confined its activities to the textile industry and found further that there was a definite trend in textiles toward the use of synthetic materials in combination with and in lieu of wool and other natural fibers. Finding that no basically new service was proposed, that no new field of carrier operations was to be invaded, and that no change was involved which would materially affect the competitive situation of existing carriers, the Commission broadened the applicant's authority to include the new products.

In the present case plaintiff maintains that it has always been in the business of serving the "factory-engineered home construction industry," and that under the "Field of Service Doctrine" it should be authorized to serve the mobile home industry which has evolved therefrom. Contrary to plaintiff's contention, the hearing examiner found that "both the record and case law show clearly that . . . the mobile home is merely an enlargement of the old house trailer which originally was pulled by passenger automobiles," [8] and is not the descendant of earlier pre-fabricated housing. In this conclusion, the examiner is supported by the analysis of the court in *Pre-Fab* II, which traces the development of the two separate industries at some length. *Pre-Fab* II, 321 F.Supp. at 1150–1151. Without entering into the comparative merits of "evolution" versus "parallel development", it seems clear that there is substantial evidence to support the Commission's rejection of the Field of Service doctrine.

C. "The denial of authority to serve many of the supporting shippers and receivers on the basis of their testimony is alone arbitrary, capricious, an abuse of discretion and without rational basis."

■ Home complains that the report of the examiner does not offer sufficient explication to enable Home and the court to comprehend the basis upon which the Commission denied a substantial amount of the authority requested. A review of the examiner's analysis and findings, particularly at pages 10 through 28 and pages 50 through 52 of the report, shows that this simply is not the case.

The examiner divided the approximately 45 public witnesses who supported plaintiff's application into three

---

7. It should also be mentioned that even if the examiner were required to consider evidence of past operations, the weight to be given that evidence is "within the discretion of the Commission." Subler Trucking, Inc. v. United States, *supra*, 313 F. Supp. at 980; Peerless Stages, Inc., 86 M. C.C. 109, 119, aff'd 371 U.S. 22, 83 S.Ct. 119, 9 L.Ed.2d 95 (1962).

8. Report, 50.

groups, and assigned different weights to the testimony of each group. The first group consisted of shippers who relied for transportation of their mobile homes primarily on their own private fleets and who used common carriers only occasionally during peak periods. Testimony from this group, complaining of unsatisfactory present service, was discounted by the examiner because, as he stated, "None [of these shippers] seems to recognize that protestant will properly give preference to shippers which use protestants for their entire production or on a more regular basis, and that applicant also cannot be expected to meet every need from a shipper which tenders only occasional traffic and that *during rush periods of summer and end of the month.*" [9] The second group was composed of shippers who depended primarily on common carriers to transport their units from manufacturing sites to dealer distribution points. Their testimony that more carriers were needed, based on delays experienced from one day to about one week, was accorded the most weight by the examiner. Significantly, the bulk of the witnesses in group two are located in the territory for which the examiner concluded more service was needed, and for which he recommended the issuance of a certificate to plaintiff. The third group comprised dealers in new and used mobile homes who complained about slow deliveries and damage in receipt of new mobile homes in initial movements from manufacturers when protestant common carriers were used. The examiner accorded their testimony virtually no weight, explaining that the dealers did not know how many homes were delivered by private carriers and how many by common carriers, that they were unable to say whether the cause of homes received in a damaged condition was attributable to the manufacturer or the carrier, and that their complaints in general were lacking in specific details such as frequency, dates, origins, identity of carriers and other basic facts.[10]

On the whole, the examiner found that the testimony of all three groups of supporting shippers failed to show specifics. "They did not show that they had investigated to find authorized carriers and then actually tried all such carriers (several were shown to have never tried certain protestants who do hold authority); they presented no records to show how often they tried to get service from authorized carriers but found no equipment available; they presented no specific data on failures of carriers to arrive for loading at promised times; they showed no traffic sample for a stated period with names of carriers used; they presented no freight bills or other company records to show that actual delivery times by carriers exceeded a reasonable norm . . .; and they presented no freight bills of correspondence to support allegations of damages to lading or failure to handle claims properly." [11] Their complaints were general, the examiner found, "and being general were too often so vague as to time and nature of movement that protestants were deprived of any opportunity to rebut same." [12] Nonetheless, the recurring albeit undocumented complaints did convince the examiner that, even allowing for fictional claims, certain *additional service was needed.*

Based on his evaluation of the evidence received, fully abstracted in his report, the examiner found that a territorial grant of authority would best meet the public's convenience and necessity, and that this consideration rather than the relative benefit to the applicant or potential adversity to the protestants should govern his decision. Specifically, the examiner mapped the plant sites of group 1 and group 2 shippers, and evaluated the needs of the territory thus engendered against considerations of existing carriers in part of the territory, the economic viability of one carrier termi-

---

9. Report, 10.

10. *Id.,* 51.

11. *Id.,* 27–28.

12. *Id.,* 28.

nal serving a single plant, and the uneconomical aspects of one-way trips. From this evaluation he concluded that the origin area would have to be limited to the states of Alabama and Georgia, in whole or part, and that the destination area, "considering primary market areas of the average group 2 shipper in that origin territory, insofar as known, must be limited to those same states, plus Florida, Mississippi, eastern Louisiana, Tennessee, and the Carolinas." [13]

Far from being arbitrary and capricious, the Commission's grant of some authority and the denial of other authority was based on a careful evaluation of the evidence presented, and on reasoned considerations of the public good. The reasons behind the examiner's recommendation are logically presented in the report, and his findings are supported by substantial evidence on the record as a whole.

For the foregoing reasons, plaintiff's motion that the decisions and orders of the Interstate Commerce Commission be enjoined and set aside is denied and the complaint is dismissed.